**In re Gregory James PASEK, Debtor.**

**DORR & ASSOCIATES, Certified Public Accountants, Plaintiff,**

v.

**Gregory James PASEK, Defendant.**

**Bankruptcy No. 86–01065–A.**
**Adv. No. 87–0515.**

United States Bankruptcy Court,
D. Wyoming.

Feb. 21, 1991.

---

248

Russell M. Blood, Casper, Wyo. and Greg L. Goddard, Buffalo, Wyo., for plaintiff.

George Jensen, Cheyenne, Wyo., for defendant.

## DECISION ON REMAND

HAROLD L. MAI, Bankruptcy Judge.

THIS MATTER is before the court pursuant to the United States District Court for the District of Wyoming's Order Remanding to the Bankruptcy Court.

The court having considered the entire record at trial, its Findings of Fact and Conclusions of Law and Judgment, the Order Remanding to the Bankruptcy Court, the instructions of the District Court, and having reviewed the applicable statutes and case law, does hereby render its Decision as follows:

This case was remanded to this court for the purpose of "further consideration in accordance with" the case of *In re Posta,*

866 F.2d 364 (10th Cir.1989). The remand was predicated on the assumption that in *Posta*, the Tenth Circuit was announcing a different interpretation of the phrase "willful and malicious" than that followed by this court in rendering its original ruling.

## BACKGROUND

The original Findings of Fact and Conclusions of Law set out the basic facts of this case, including the existence of a covenant not to compete in the Partnership Agreement. In addition, the following facts appear in the record and contributed to this court's determination that the defendant's actions were not "willful and malicious" within the meaning of § 523(a)(6).

1. In 1985, the defendant married Paula Jean Pasek (Mrs. Pasek). At that time, and thereafter, he had custody of his three (3) young children from his previous marriage. Mrs. Pasek also had a young son at the time of their marriage. Mrs. Pasek's son has asthma. Mr. Pasek's youngest child from his first marriage had several life-threatening medical problems and required extensive medical care throughout the early years of their marriage. After their marriage, the Paseks together had another son.

2. Thus, during 1986, Mrs. Pasek was struggling to make a home for a family which included her young son, her three (3) young stepchildren from Mr. Pasek's previous marriage, and the new baby born of her marriage to Mr. Pasek. Mrs. Pasek's responsibilities were complicated by the serious health problems of two (2) of the children.

3. By the beginning of 1986, Mr. Pasek was finding it difficult to reconcile his increasing family responsibilities with the time commitment required to meet his billing quota (called budget goals) imposed by the partnership.

4. During 1986, various members of the plaintiff partnership decided that partners and their spouses should present a certain image in the community at large, especially to their clients and prospective clients.

5. At the end of April of 1986, shortly before the defendant left the firm, the Paseks attended a firm retreat held in Las Vegas, Nevada. During the retreat, the Paseks attended a meeting where Mr. Dorr, one of her husband's partners, lead a discussion wherein Mrs. Pasek was subjected to criticism of the type of vehicle she drove and for her attire or grooming when she interrupted care of the family horses for trips into town. The Paseks were informed that, in order for the firm to project a certain image in the community, partners and their spouses should select certain types of vehicles and dress in a certain way on trips into town. They were also told they would be shown appropriate ways in which to decorate their home.

6. Later during the retreat, Mr. and Mrs. Pasek attended a firm dinner held in a nice public restaurant. During this dinner, the actions and manners of those attending, including Mrs. Pasek, were subjected to extensive scrutiny and some person or persons actually attempted to levy monetary fines for purported breaches of manners. Mrs. Pasek walked out of the dinner.

7. At least one (1) other accountant for the firm left in large part due to this type of interference in the private lives of the employees and their families.

8. After the Las Vegas dinner, Mrs. Pasek told Mr. Pasek that, under the circumstances, if he stayed with the firm he would have to find himself another wife. Although he attempted over the next two (2) months to work out a compromise, Mr. Pasek finally believed he had to leave the partnership for the sake of his family.

9. Upon leaving, Mr. Pasek found himself with no job, no money, a wife and five (5) children to support, including a chronically ill child who would undergo a kidney transplant in the following year. Maintaining health insurance for this child was a major concern for Mr. Pasek after he left the partnership. His home was burdened with a second mortgage arising from his contributions to the plaintiff partnership. He was burdened with large contingent liabilities arising from debts incurred while he was a partner in Dorr and Associates.

These partnership debts made it impossible for him to borrow any money without a co-signer.

10. The attempted imposition of partnership standards for such private family matters as home decoration, automobile selection, and spousal attire, grooming, and manners, created an undue hardship for Mr. Pasek. This hardship materially contributed to Mr. Pasek's belief that he was forced to leave the partnership for the sake of his family life.

11. Mrs. Pasek, of course, was not an employee of the partnership and was not a party to the partnership agreements. Nonetheless, the partnership attempted to assert control over her person and the way her family lived as part of her husband's involvement with the partnership.

12. Also contributing to Mr. Pasek's belief that he had to leave the partnership was its insistence that he continue to carry one of the two (2) highest billing hour quotas in the partnership. At the time, Mr. Pasek felt he needed to decrease, not increase, the hours he worked in order to meet his family responsibilities. Also Mr. Mark Dorr, his partner, had arranged for the partnership to acquire another accounting firm, a decision with which Mr. Pasek strongly disagreed for several reasons. One of the reasons was that Mr. Pasek felt the transaction would double the debt load for the partnership when it already had trouble with cash flow and meeting its payroll.

13. The hours required of him particularly upset Mr. Pasek due to his belief that the partnership assigned many of his best clients to other members of the partnership, while retaining his high budget goal.

14. Additionally, Mr. Pasek felt that the partnership had accepted a disproportionately small settlement from another partner who had left the partnership and started his own practice in 1985. He felt that the failure to more aggressively enforce the covenant not to compete against that former partner resulted in an increased debt load for himself personally. Mr. Pasek was bitter about this. He felt the covenant was not enforced because of that former partner's remaining economic ties to Mr. Mark Dorr, an influential member of the partnership.

15. Against this background, Mr. Pasek believed that he had to begin to work on his own to insure the economic survival of his family. He rationalized that he had originated many clients for the firm, that in light of the equity he was leaving with the partnership, and its low profit margin that his leaving would be "a wash." He obtained an opinion from legal counsel that the covenant not to compete might not be enforceable due to the technicality of the Partnership Agreement being executed by his professional corporation.[1]

16. With the help of co-signed loans by some clients who were also friends, he obtained funds to open an office.

17. The defendant then chose to breach the covenant not to compete in the hopes that it would prove ultimately unenforceable. He chose to recruit clients that he knew were clients of the plaintiff because he feared he would be unable to make a living for his family unless he sought work from all possible sources.

18. The plaintiff partnership, of course, had its own view of the events leading up to Mr. Pasek's departure. As discussed at trial, these included the assertions that he was unwilling to continue to carry what they believed to be a necessarily high budget quota, that he was unwilling to disclose his outside dealings with clients, and that he was a technical person who did not recruit clients for the partnership.

19. The conflicting testimony may be summed up as follows: Mr. Pasek felt that due to the demands by the partnership, he was forced to leave and begin to support his family by whatever means were available. The partnership, on the other hand, believes that Mr. Pasek was treated fairly and that he left and took partnership

---

1. As stated in this court's Findings of Fact, Mr. Pasek was fully aware of the covenant not to compete and its application to all partners. He hoped, however, to eventually avoid liability by reason of the technicality.

clients solely for his personal gain at its expense.

## DISCUSSION AND CONCLUSIONS

■ For dischargeability purposes, the issue is not whether or not the defendant was objectively justified in his breach of the covenant not to compete. Instead, the issue is whether or not the record in this case establish an intentional injury to the partnership. Upon review of the entire record of this case on remand, the court must conclude, once again, that it does not.

■ To begin with, the court notes that the creditor's burden of proof in establishing a willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6) must be met by only the preponderance standard and not the clear and convincing standard previously followed in the Tenth Circuit. *Grogan v. Gardner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, this change in the standard of proof does not change the result in this case as this court previously held that the plaintiff failed to establish the requisite willful and maliciousness of the action by "even a preponderance of the evidence."

■ Section 523(a)(6) of the Bankruptcy Code provides an exception to discharge for debts resulting from a "willful and malicious injury to another entity or to the property of another entity." This court has always followed the rule, subsequently adopted by the Tenth Circuit Court of Appeals in *In re Compos*, 768 F.2d 1155 (10th Cir.1985), that "willful and malicious" requires proof of an intent to injure. *Compos*, 768 F.2d at 1158.

While this case was on appeal, the Tenth Circuit Court of Appeals published another decision involving section 523(a)(6). *In re Posta*, 866 F.2d 364 (10th Cir.1989). In *Posta*, the Tenth Circuit held

Under § 523(a)(6), the debtor's malicious intent can be shown in two ways. In the rare instances in which there is

direct evidence that the debtor's conduct was taken with the specific intent to harm the creditor, the malice requirement is easily established. More commonly, however, malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. Such knowledge can be inferred from the debtor's experience in the business, his concealment of the sale, or by his admission that he has read and understood the security agreement.

*Id.* at 367.

Because this court had followed the interpretation contained in *Compos*, the District Court remanded this case for the purpose of reconsidering the ruling in light of the *Posta* decision.

Upon reconsideration, this court concludes that it applied the correct standard. The standard announced in *Compos* was expressly reaffirmed in the case of *In re Thurman*, 901 F.2d 839, 841 (10th Cir. 1990). In *Thurman*, the court left no doubt that the "test of dischargeability in this circuit under 11 U.S.C. § 523(a)(6) is established in *Compos.*" *Id.*

In *Thurman*, the Tenth Circuit also laid to rest the question of the applicability of its 1984 case, *First National Bank of Albuquerque v. Franklin (In re Franklin)*, 726 F.2d 606, to cases under § 523(a)(6) the Bankruptcy Code, holding that it is *only* applicable to cases under § 17(a)(8) of the Bankruptcy Act of 1898 and *not* to cases under § 523(a)(6).[2] *Id.* at 841 (any reference made in *Franklin* to § 523(a)(6) "was unfortunate and dictum").

After *Thurman*, the Tenth Circuit published another decision following the interpretation announced in *Posta*. *In re Grey*, 902 F.2d 1479 (10th Cir.1990). In *Grey*, as in *Posta*, the complaint alleged that a debtor had "willfully and maliciously" converted property of the creditor by selling its

---

2. Despite the fact that *Franklin* was never intended to be applicable to § 523(a)(6), it was nonetheless the case largely relied upon by the Sixth Circuit in *Perkins v. Scharffe (In re Scharffe)*, 817 F.2d 392 (6th Cir.1987), in con-struing § 523(a)(6) of the Bankruptcy Code. Unfortunately, this reliance has lead to a confusion about the standard to be applied under § 523(a)(6).

collateral and not delivering the proceeds to the secured creditor. Without analysis, the court in *Grey* quoted some of the language from *Posta* and found sufficient evidence of a willful and malicious injury.

Addressing the third argument next, debtor asserts that his sale of collateral was not malicious. Under § 523(a)(6), maliciousness is established if the debtor possesses actual knowledge, or it is reasonably foreseeable, that his conduct will result in injury to the creditor. *In re Posta*, 866 F.2d 364, 367 (10th Cir.1989). The bankruptcy court's factual findings support the determination that debtor's sale of collateral was willful and malicious. *See id.*

902 F.2d at 1481.

These cases from the Tenth Circuit, *Compos, Posta, Thurman,* and *Grey,* may be easily harmonized by acknowledging that the interpretation applied in *Posta* and *Grey* is only applicable to the specific situation where the injury in question is a conversion of a secured creditor's interest in collateral or its proceeds. This view is supported by a review of the cases cited in *Posta* for the proposition that malicious intent can be inferred where a debtor acts in knowing violation of the creditor's rights in the collateral. Every single one of those cited cases arises from the situation where the creditor alleged the debtor had converted its collateral or proceeds of its collateral. *Posta*, 866 F.2d at 367–8.

Thus, the interpretation announced in *Posta*, and later followed in *Grey*, is applicable only to those cases under § 523(a)(6) where the alleged injury is conversion of collateral or its proceeds.

For all other allegedly willful and malicious injuries, the requirement remains, as clearly stated in *Thurman*, that the creditor establish the debtor's intentional or deliberate injury to that entity or to the property of that entity. As the legislative history relied upon in *Compos* makes clear, section "523(a)(6) does not except from discharge intentional acts which cause injury; it requires instead an intentional or deliberate injury." 768 F.2d at 1158.

In the present case, such an intentional injury has not been shown. However "wrongful" the debtor's actions in breaching the covenant not to compete may have been in the abstract, they were not directed at injuring the partnership. Instead, they were directed at simple economic survival for his family unit. It was foreseeable in a general way that recruiting clients of the partnership may result in an economic injury to the partnership. However, he felt justified in his actions by his feeling that he was forced to leave the partnership for the sake of his family whose economic survival was then at risk.

■ It is almost always foreseeable in the abstract that a breach of contract will result in some form of economic harm to the other party to the contract. A breach of contract frequently results from an intentional act by the party which chooses not to complete its obligations under the contract for whatever reason. For example, a company may intentionally choose to discontinue performing under a contract that proved unprofitable. That choice is an intentional act that foreseeably will result in economic injury to the other party. However, an intentional breech of contract, without more, is not sufficient to establish a willful and malicious injury for the purposes of § 523(a)(6).

■ The focus, for dischargeability purposes, is not on the wrongfulness of the intentional breach. Instead, the focus for § 523(a)(6) is on the debtor's intent when he took the action. If, for example, the company in the above example breached the contract for the express purpose of putting the other company, which was a business rival, out of business, then the intent to injure, and therefore the willfulness of the actions, is established.

There are courts which have adopted a different standard for establishing the willfulness of an injury for the purpose of dischargeability under § 523(a)(6). See, e.g., *In re Woolner*, 109 B.R. 250, 252 (Bankr.E.D.Mich.1990). Many of these courts employing the lower standard have adopted the test first set forth in the Supreme Court case of *Tinker v. Colwell*, 193

U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), and have also relied upon *In re Franklin,* supra.

As noted in *Compos,* the *Tinker v. Colwell* standard was expressly rejected by Congress when it enacted the 1978 Bankruptcy Code.

We hold that the legislative history of § 523(a)(6) of the Code expressly establishes Congress's intent to render obsolete *Tinker* and its progeny and to make the "reckless disregard" standard applied by some courts under the Act inapplicable under § 523(a)(6) of the Code. In short, it was the express intent of Congress to define "willful" for purposes of § 523(a)(6) to mean "deliberate or intentional".

768 F.2d at 1158.

In *Tinker v. Colwell,* the Supreme Court had construed willful to mean an act that is intentional and voluntary. *Id.* at 485, 24 S.Ct. at 508. Under *Tinker v. Colwell,* if an act was intentional, it was willful. The Supreme Court then also adopted the following definition for malice:

In *United States v. Reed,* 86 Fed. 308, [ (C.C.N.Y.1897) ], it was held that malice consisted in the *wilful* doing of an act which the person doing it knows is liable to injure another, regardless of the consequences; and a malignant spirit or a specific intention to hurt a particular person is not an essential element. Upon that principle, we think a *wilful* disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done wilfully and maliciously, so as to come within the exception.

\* \* \* \* \* \*

'Malice, in common acceptation, means ill will against a person; but in its legal sense it means *a wrongful act, done intentionally, without just cause or excuse.* If I give a perfect stranger a blow likely to produce death, I do it of malice, because I do it intentionally and without just cause or excuse. If I maim cattle, without knowing whose they are, if I poison a fishery, without knowing the owner, I do it of malice, because it is a wrongful act, and done intentionally. \* \* \* If I traduce a man, whether I know him or not and whether I intend to do him an injury or not, I apprehend the law considers it as done of malice, because it is wrongful and intentional. It equally works an injury, whether I meant to produce an injury or not....'

Id. at 485 and 487, 24 S.Ct. at 508 and 509 (emphasis added) (quoting *Bromage v. Prosser,* 4 Barn. & C. 247).

This language discussing malice is, of course, the genesis of the rule now applied in such opinions as the Sixth Circuit's *Scharffe decision:* [3] a "wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 817 F.2d at 394 (quoting 3 COLLIER ON BANKRUPTCY at 523–111 (15th ed. 1986).

The problem with many of the opinions adapting the *Tinker v. Colwell* definition of malice, is that they fail to recognize that this definition, although it refers to an intentional act, no longer is sufficient to establish "willful" under § 523(a)(6) of the Bankruptcy Code.

In other words, under the *Tinker v. Colwell* interpretation, if an action were malicious it must also be willful, because the two (2) elements of willful [4] were already contained in the four (4) elements of malice.[5] However, the definition of willful under § 523(a)(6) now contains an additional

---

**3.** Naturally, this was also the rule applied in *Franklin, supra,* because it was decided under the former Bankruptcy Act, to which *Tinker v. Colwell* remains applicable.

**4.** The elements of willful under *Tinker v. Colwell:*

   (1) an act; and

   (2) performed intentionally or voluntarily.

**5.** The elements of malice under *Tinker v. Colwell:*

   (1) an act;

   (2) that is wrongful (i.e., injurious or producing harm to rights of another);

   (3) performed intentionally; and

   (4) which is without just cause or excuse.

element[6] which is not present in the definition of malice namely, a deliberate or intentional injury. *Compos,* 768 F.2d at 1158.

■ Accordingly, under § 523(a)(6), it is no longer sufficient to establish only a wrongful act, done intentionally, which necessarily produces harm and is without just cause or excuse. That only establishes malice. To find willful, the court must additionally find an intentional or deliberate injury. Under the Bankruptcy Code, all elements of willful are no longer already found in the definition of malice because an act "necessarily causing injury" is not the same thing as an "intentional injury."

In view of Congress's express rejection of the rule announced in *Tinker v. Colwell* when it enacted the Bankruptcy Code of 1978, it is surprising how many courts continue to use verbatim language from the case in setting forth a standard applicable to § 523(a)(6) without recognizing that willful is no longer subsumed under malice.

■ This court does not agree with those cases arguing that the higher standard for willful imposed by Congress for § 523(a)(6) makes it nearly impossible to establish the intent to injury in the absence of a confession by the debtor. The requisite intent to injure may be shown by circumstantial evidence and by the overall record as a whole, including the natural inferences from the facts. A plaintiff's burden in this regard is now made easier by the adoption of the preponderance of the evidence standard of proof instead of the clear and convincing standard of proof.

Even if this court were to apply the lesser standard adopted by many other courts, the defendant's breach of contract does not, on the entire record in this case, establish a willful and malicious injury within the meaning of § 523(a)(6).

By its own actions, the plaintiff attempted to impose a new condition of employment on defendant that was not contemplated at the time the parties entered into the Partnership Agreement containing the covenant not to compete. That condition

was that both the partner and his spouse, a non-party to the contract, subject themselves to partnership-imposed standards regarding personal and family matters. The plaintiff materially changed the contract, imposing undue hardship and unreasonable restrictions on the defendant. Similarly, the enforcement of the second highest budget quota in the accounting practice is a condition that does not appear in the Partnership Agreement. Where the partnership materially altered the conditions of the Partnership Agreement, the court cannot say, taking into consideration the entire circumstances as developed at trial, that his breach of the covenant was without just cause or excuse.

Further, the defendant breached the covenant not to compete after consulting counsel and obtaining an opinion that it was unenforceable. In acting in reliance on such an opinion, the court cannot conclude that his action was without just cause or excuse.

Even though there is much bitterness between the parties, this case involves a simple breach of contract. The facts, as developed at trial, do not establish a willful and malicious injury within the meaning of § 523(a)(6).

---

**6.** Under *Compos* the three (3) elements of willful within the meaning of § 523(a)(6) are:
　(1) an act;
　(2) intentionally performed;
　(3) with an intent to injure.