In re Joseph B. KETANER, Debtor.

TRADITIONAL INDUSTRIES, INC.
and Direct Sales of America,
Inc., Plaintiffs,

v.

Joseph B. KETANER, Defendant.

Bankruptcy No. 91–20962–T.
Adv. No. 91–2162–T.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Dec. 30, 1992.

Mark H. Mapp, Samuel J. Webster, Williams, Kelly & Greer, P.C., Norfolk, VA, for plaintiffs.

Harry W. Jernigan, III, Virginia Beach, VA, for debtor/defendant.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This adversary proceeding came on for trial on the plaintiffs' complaint to determine the dischargeability of a debt pursuant 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6). However, at the close of the plaintiff's evidence plaintiff chose to proceed only under 11 U.S.C. § 523(a)(6). After three days of trial the court took the matter under advisement. For the reasons stated in this memorandum opinion the court concludes that the $500,000.00 debt owed to plaintiff is a non-dischargeable debt under 11 U.S.C. § 523(a)(6).

### Findings of Fact

In early 1986 Joseph Ketaner the sole stockholder of Direct Sales of America, t/a Worldwide Distributors ("DSA"), and Arland Dunn, Chairman of the Board and Chief Executive Officer of Traditional Industries, Inc. ("Traditional"), began discussions regarding the sale of DSA's stock to Traditional.[1] Eventually a sale was consummated on September 1, 1986, by which Traditional acquired all of the outstanding stock of DSA. As consideration for the sale Ketaner received approximately $1,200,000.00 and an employment contract providing him a substantial salary. DSA continued to operate from its headquarters in Virginia Beach, Virginia.

Under the terms of the employment agreement Ketaner remained as President and Chief Executive Officer of DSA. Ketaner's base salary was $120,000.00 per year. Ketaner was eligible to receive an incentive bonus to be calculated in the following manner:

The Bonus shall equal the sum of twenty-five percent (25%) of the excess, if any, of Subsidiary's pre-tax *profits* over eighteen percent (18%). The Bonus is to be paid annually within ninety (90) day of Traditional's year-end.

(Plaintiff Exhibit 3, p. 3) (emphasis added).

Ketaner's employment contract also contained the following "non-competition" clause which is the crux of Traditional's complaint:

During the Term of this Agreement and for a period of two (2) years from any termination thereof, Employee covenants and agrees that neither he, nor any member of his immediate family, will enter into, promote, engage in, or finance any

---

1. At all relevant times Traditional and DSA were in the business of financing direct sales of certain consumer products or packages, such as photographic equipment, film developing services, encyclopedias and other reference book packages. In turn, the contracts were used as collateral security to finance the companies' operations.

enterprise which is competitive with any products or in any respect with the presently existing business of Employer or any of its subsidiaries in any state or territory of the United States in which Employer does business at the time of termination. Employee acknowledges that this covenant is given in connection with the sale of his entire business, the Subsidiary, to Employer, and in consideration of the purchase by Employer, of the Subsidiary.

During said two (2) year period during which Employee may not compete, Employer agrees to pay a consulting fee of $35,000.00 per year payable weekly.

(Plaintiff Exhibit 3, pp. 7–8).

In the Spring of 1987 tensions developed between Ketaner and Traditional concerning the bonus clause in Ketaner's employment contract. Although DSA's gross sales volume increased exponentially under Ketaner, Traditional believed this was accomplished through unsound credit practices that impaired overall profitability.[2] Increased bad debt expense was illustrated in a company report which reflected the number of customers who failed to make their first installment payment on credit purchases.

Throughout 1987 Ketaner became increasingly concerned about receiving a bonus. Apparently, Ketaner insisted that his bonus clause be re-written so that his bonus would be calculated on gross sales as opposed to profits. In fact, Ketaner was so obsessed with the bonus issue that he unilaterally declared his employment contract "null and void" by telegram on July 21, 1987. This prompted Traditional to negotiate with Ketaner. A settlement was tentatively reached on terms favorable to Ketaner conditioned upon Ketaner improving the quality of DSA contracts. As of late 1987 the quality of DSA's contracts had not improved, but Ketaner was still obsessed with renegotiating his employment contract. Accordingly, the tentative settlement fell through.

Because of Ketaner's continuous and relentless verbal pursuit of the bonus he desired and his failure to respond to Traditional's concerns about the creditworthiness of DSA's contracts, Traditional placed Ketaner on a three month leave of absence with full benefits and pay. This was accomplished by a letter to Ketaner dated December 9, 1987, from Traditional's president Arland Dunn. This letter, which was delivered to Ketaner in his Virginia Beach office by Richard Grace, another Traditional officer, provided as follows:

1. Effective immediately, you are placed on a three (3) month leave of absence, after which time the Board will consider your continuing position with DSA.

2. You are directed to leave the premises of DSA immediately upon receipt of this letter, taking with you, your personal belongings.

3. During the period of your leave of absence, you are directed to abstain from any and all contact with the dealers, contractors, employees and representatives of DSA, TI or its subsidiaries, which contact concerns the business of DSA or the relations between you and TI or between DSA and TI.

4. You are directed to inform the undersigned, in writing, of the address to which your salary checks should be sent and where you may be contacted during your leave of absence.

You are reminded that the terms of your Employment Agreement with TI continue to govern our relationship. During your leave of absence, communications with TI should be in writing, addressed to the undersigned.

Very truly yours,

TRADITIONAL INDUSTRIES, INC.

By Arland D. Dunn

President and Chairman of the Board

(Plaintiff Exhibit 7, p. 4).

Concurrent with this action Traditional appointed Richard Grace as acting president and chief executive officer of DSA to

---

**2.** Typically, direct sales operations use independent contractors as salesmen who submit contracts. A credit evaluation is done, and if the contract is accepted, merchandise is shipped, a commission is paid the salesmen, and the customer makes payments directly to the business.

replace Ketaner. Traditional's actions were taken to provide a "cooling off" period for the parties to resolve their differences outside the daily operations of DSA.

Ketaner treated the December 9, 1987, letter as a notice of termination and immediately began discussions with a business acquaintance, William A. Stafford, II, about forming a new company to engage in the same business as Traditional and DSA. On December 30, 1987, Ketaner and Stafford held what amounted to an "organizational meeting" at a prominent Virginia Beach hotel in anticipation of forming the new company. Although the organizers had placed a newspaper advertisement seeking employees for the new venture, only DSA employees attended the meeting.

On January 4, 1988, the new corporation, which was named Galaxy–Wide Products, Inc., ("Galaxy–Wide"), filed articles of incorporation and opened for business with stationary and a full staff, virtually all of whom had come over from DSA. The Virginia State Corporation Commission issued a certificate of incorporation on January 6, 1988. (Plaintiff's Exhibit No. 13). The capital for the corporation included $100.00 put up by Stafford's wife, a loan from National University Society ("NUS") in the amount of $600,000.00, and a loan from Ketaner of approximately $1,000,000.00.

After learning about the establishment of Galaxy–Wide and the virtual complete defection of DSA's staff, Traditional officially terminated Ketaner's employment. However, on January 20, 1988, Traditional tendered to Ketaner the first consulting fee check called for under the "non-competition" clause in Ketaner's employment contract. (Plaintiff Exhibit 3, p. 8). These checks were returned by Ketaner. (Plaintiff Exhibit 18).

Traditional and DSA eventually filed suit against Ketaner, Stafford, and Galaxy–Wide in Virginia Beach Circuit Court. The circuit court referred the matter to a commissioner in chancery who was directed to take evidence and render proposed findings of fact and conclusions of law for consideration by the court. After hearing four days of evidence the commissioner recommended judgment against defendants Ketaner and Galaxy–Wide [3] in favor of plaintiffs in the amount of $440,000.00 plus $60,000.00 attorneys' fees. In responding to the referral from the circuit court, the commissioner made affirmative findings as follows:

1. Galaxy–Wide and Stafford encouraged, induced and conspired with Ketaner to violate the covenant not to compete, entitling plaintiffs to damages in the amount of $440,000.00;

2. Ketaner breached his employment contract with Traditional, resulting in damages in the amount of $440,000.00;

3. Galaxy–Wide, Stafford and Ketaner tortiously interfered with plaintiffs' contractual and business relations and prospective advantage;

4. Galaxy–Wide, Stafford and Ketaner conspired to injure and injured plaintiffs in their trade and business in violation of Virginia Code § 18.2–499 and § 18.2–500;

5. Ketaner breached his fiduciary duty to plaintiffs, resulting in damages in the amount of $440,000.00;

6. Plaintiffs are entitled to their costs of suit and reasonable attorneys' fees, the latter in the amount of $60,000.00.

(Commissioner's Report, pp. 38–39).[4]

Moreover, the commissioner responded negatively to the circuit court's referral of

---

3. The commissioner made the following recommendation:

The Commissioner recommends that a judgment be entered in favor of the plaintiffs in ... [the amount of $440,000.00] ... against all defendants, jointly and severally, except Stafford, and that the matter be stayed as to him due to his *bankruptcy* filing. The Commissioner further recommends that al costs of this proceeding be assessed against the said two defendants, jointly and severally, and that

each party pay his or its own attorney's fees and costs, except that a judgment be entered against said two defendants for the sum of $60,000.00 representing attorney's fees.
(Commissioner's Report, p. 32) (emphasis in original).

4. The Commissioner in Chancery also made the following remarks concerning the defendants' conduct:

[T]he defendants have formed, encourage, financed, ... managed a business that is inten-

inquiries concerning Ketaner's counter allegations against Traditional and DSA concerning breach of the employment contract with Ketaner. (Commissioner's Report, pp. 38–39).

The Virginia Beach Circuit Court overruled all exceptions to the commissioner's report and entered judgment against defendants Ketaner and Galaxy–Wide and in favor of Traditional and DSA in the amount of $500,000.00. Ketaner subsequently filed bankruptcy.

### Position of Parties

TRADITIONAL AND DSA.

Plaintiffs' assert Ketaner's deliberate and intentional violation of his employment agreement, his financing and formation of Galaxy–Wide, and his direct competition with DSA clearly constitutes "willful and malicious injury by the debtor to another entity or to the property of another entity" under 11 U.S.C. § 523(a)(6).

In addition, plaintiffs' allege the proper measure of Ketaner's non-dischargeable debt is $500,000.00. This constitutes the amount of damages found by the state court which was based on the profits reported by Galaxy–Wide for the first six months of 1989. This is also the amount of debt to Traditional listed by Ketaner in his bankruptcy schedules.

KETANER.

Ketaner asserts that Traditional breached the employment agreement by terminating him. Ketaner argues the letter of December 9, 1987, was a notice of termination which in effect made him a "free agent."

Ketaner also submits he relied on advice of counsel that his participating in the formation of Galaxy–Wide as a consultant was not in violation of the "non-competition" clause in his employment contract. This reliance, Ketaner argues, precludes any finding of "willfulness" or "maliciousness."

In the alternative, Ketaner is willing to concede that his involvement with Galaxy–Wide may have involved "aggressive and fierce" competition with DSA. However, Ketaner asserts that "competitive activities" should not be deemed to be malicious without evidence of malicious intent because "competition is the true American way." Essentially, Ketaner argues he was motivated by profit, not malice.

Lastly, Ketaner argues that no direct evidence of damages was presented at trial. He asserts that reliance on the commissioner's report is inappropriate because other factors may have contributed to DSA's demise and Traditional's eventual bankruptcy. He argues that "it is not practical that such business failure is exclusively attributable to the actions of one person, or one competitor."

tionally, willfully, knowingly, and voluntarily in direct competition with Traditional Industries and DSA, relying solely upon a friendly advocacy opinion letter from an attorney long before hired by *Ketaner* as an advocate to negotiate for him a better deal than he had made pursuant to the agreements which are the subject of this suit.... The defendants played Russian roulette and, in the opinion of the Commissioner, they lost, and their actions were ill-advised and ill-conceived.... In equity this cannot be allowed, and to allow the same to happen with impunity would be to shock the conscience of the Commissioner. The scenario in this case in not only obvious, it borders on the obscene.... If a man can sell a company for $1,200,000 and agree to be its president and chief executive officer and agree to owe it a duty of good faith and loyalty and, in effect, a fiduciary relationship, and then ... unilaterally declare his solemn agreements "null and void" and promote orga-nize, [and] finance ... a competing business, proselytizing the entire staff of the company that he sold with impunity and then thumb his nose at the buyer and his boss and the law, then we are reduced to anarchy....

[T]he defendants are guilty of conduct which does not meet with acceptable commercial standards of the moral marketplace even in French Morocco.... [Ketaner] has, in effect, crippled the business of DSA and hindered and defeated it.... Even in the absence of the covenant not to compete his actions are reprehensible in the opinion of the Commissioner. He has, in effect, sold to Traditional Industries a horse with a glass eye and then plucked out the horse's good eye and should be responsible, together with his co-conspirators, Galaxy and Stafford, to account for the profits resulting therefrom as if those profits were held in trust for DSA and Traditional.

(Commissioner's Report, pp. 11–15).

*Discussion and Conclusions of Law*

 The issue before the court is whether Ketaner's violation of the "non-competition" in his employment agreement with Traditional constitutes "willful and malicious" injury under 11 U.S.C. § 523(a)(6). Section 523(a)(6) excepts from discharge any debt "for *willful and malicious* injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (emphasis added). The term "willful" means "a deliberate or intentional act which necessarily leads to injury." *Rountrey v. Lee (In re Lee)*, 90 B.R. 202, 207 (Bankr.E.D.Va.1988). As to the definition of maliciousness, there is no requirement that specific malice or spite be proven. *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985). Implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6). *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d at 1010.

 Intentional breach of a valid covenant not to compete in an employment agreement can constitute "willful and malicious" injury under 11 U.S.C. § 523(a)(6). *Ozark National Life Insurance Company v. Hallahan (In re Hallahan)*, 78 B.R. 547 (Bankr.C.D.Ill.1987), *aff'd*, 113 B.R. 975 (C.D.Ill.1990), *aff'd*, 936 F.2d 1496 (7th Cir. 1991); *but see Dorr & Associates v. Pasek (In re Pasek)*, 129 B.R. 247, 252 (Bankr. Wyo.1991).[5] Although the court in *In re Pasek* ruled that the debtor's actions were not "willful" and "malicious," that case provides a useful comparison to our case.

In *Pasek* the court held that the debtor's breach of a covenant not to compete was not "malicious." The debtor was a partner in an accounting firm, and the court found that the plaintiff partnership materially altered the conditions of the partnership agreement by interfering in the debtor's private life. *In re Pasek*, 129 B.R. at 249. Apparently, the partnership insisted that the debtor drive a particular car and that

debtor's wife dress in a certain way to promote the firm's image in the community. At one point the partnership even tried levy monetary fines for purported "breaches of manners." *In re Pasek*, 129 B.R. at 249. Moreover, the court in *Pasek* found that the economic survival of the debtor and his family was at stake since two of the debtor's five children had experienced serious medical problems. 129 B.R. at 249–50. Therefore, the court concluded that debtor's breach was *not* without just cause or excuse.

 Although extraordinary circumstances, which are not present in this case, led the court in *Pasek* to conclude that the debtor's breach was not malicious, the court's analysis supports a conclusion that Ketaner's breach in this case does constitute a "willful and malicious" injury. In *Pasek*, the court stated in dicta:

It is almost always foreseeable in the abstract that a breach of contract will result in some form of economic harm to the other party to the contract. A breach of contract frequently results from an intentional act by the party which chooses not to complete its obligation under the contract for whatever reason. For example, a company may intentionally choose to discontinue performing under a contract that proved unprofitable. That choice is an intentional act that foreseeably will result in economic injury to the other party. However, an intentional breech of contract, without more, is not sufficient to establish a willful and malicious injury for the purposes of § 523(a)(6).

The focus, for dischargeability purposes, is not on the wrongfulness of the intentional breach. Instead, the focus for § 523(a)(6) is on the debtor's intent when he took the action. *If, for example, the company in the above example breached the contract for the express purpose of putting the other company, which was a business rival, out of business, then the intent to injure, and*

**5.** Although I ruled from the bench that collateral estoppel was inapplicable in this case, the report of the commissioner in chancery has been considered as evidence. However, the court's decision is primarily based on evidence presented before this court.

*therefore the willfulness of the actions, is established.*

*In re Pasek,* 129 B.R. at 252 (emphasis added).

The facts and circumstances surrounding Ketaner's intentional breach of the "noncompetition" clause in his employment agreement, including the natural inferences from those facts, leads the court to conclude that Ketaner's conduct constituted "wilfull and malicious" injury to DSA and Traditional in the amount of $500,-000.00.

It is clear from the facts that Ketaner was obsessed about re-writing the bonus clause in his contract. At one point he declared his employment agreement "null and void" over this issue in an attempt to pressure Traditional to renegotiate. In short, the court is convinced that Ketaner's formation of Galaxy–Wide was an effort to unilaterally rescind all of his agreements with Traditional. The facts and circumstances surrounding Ketaner's formation of Galaxy–Wide, a business rival of DSA, necessarily put DSA out of business. The evidence clearly shows that Ketaner induced almost the entire staff of DSA to resign and work for his new company, Galaxy–Wide. In the words of the commissioner in chancery, Ketaner "proselytized" the entire staff of the company he sold with "impunity" and "thumbed his nose" at the buyer, Traditional. (Commissioner's Report, p. 13). In this respect, I must agree with the commissioner's analysis.

In defense of his actions Ketaner asserts his reliance on advice of counsel that he would not be in breach of the "noncompetition" clause by participating in the formation of Galaxy–Wide negates any inference of "wilfulness" or "maliciousness." In support of this position Ketaner cites the case of *Vaughan v. Murray (In re Murray),* 116 B.R. 473 (Bankr.E.D.Va.1990). In *Murray* Judge Bonney held that "where a defendant has fully and in good faith disclosed the facts to counsel, where counsel advises him as a matter of law, and where the defendant acts on this advice believing that he has been properly ad-

vised, he is not guilty." 116 B.R. at 477. Although the facts in *In re Murray* warranted such a conclusion, the facts in this case do not.

In *Murray* the debtors ran a financially distressed business which they closed under advice of counsel. Assuming that the inventory from the suppliers was security financed, counsel advised the debtors to return brand name merchandise to the suppliers in settlement of accounts. *In re Murray,* 116 B.R. at 475. When debtors questioned this advice they were told by counsel that the purchase money security interest of the suppliers had priority over the security interest of the plaintiffs. *In re Murray,* 116 B.R. at 475. This advice eventually proved erroneous and led to the plaintiff's § 523(a)(6) complaint.

■ Unlike the debtors in *Murray,* Ketaner was looking for a legal argument to justify circumventing his agreements with Traditional. Simply being able to construct a legal argument to support one's actions is insufficient to invoke the protection provided for in *Murray.* Moreover, the court has no evidence that Ketaner "fully and in good faith" disclosed all pertinent facts to counsel. Accordingly, Ketaner's argument that his actions were not "willful" or "malicious" because he relied on advice of counsel is untenable. Ketaner asserts other arguments on the merits which I find unnecessary to discuss.

■ Lastly, Ketaner raises the issue of damages. He asserts that no evidence was presented on damages, or that at least no causal link between his actions and DSA's demise has been proven. I disagree.

Plaintiffs have provided the court with the state court judgment they obtained against Ketaner in the amount of $500,-000.00. The rationale for the amount of the damages was to disgorge wrongfully diverted profits from Ketaner and the other defendants. Essentially, the state court found that Ketaner's actions imposed a constructive trust on the profits earned by Galaxy–Wide's in 1989.[6] The court accepts

6. In referring to the recommended damages the

Commissioner stated:

the state court judgment as uncontroverted prima facie evidence of the damages suffered by DSA and Traditional.

Accordingly, the court will enter judgment in favor of the plaintiffs excepting the $500,000.00 state court judgment against Ketaner from discharge pursuant to 11 U.S.C. § 523(a)(6).

A separate order will be entered.

[T]he Commissioner would be recommending the imposition of a constructive trust on the profits wrongfully diverted, and the Court should award actual damages (and probably should award exemplary or punitive damages, but the Commissioner does not recommend the exemplary or punitive damages which are, in effect, foreign to a court of equity).... (Commissioner's Report, p. 15).

[T]he damages recommended herein are a minimum figure as compensatory damages and probably should be higher and that prob-

ably exemplary or punitive damages should be considered

. . . . .

(Commissioner's Report, p. 16).

In this case, a regular and established business was destroyed, and if the measure of damages were the diminution in value of the business by reason of the wrongful act or the net loss of the business, the damages would probably be even higher. (Commissioner's Report, p. 34).