**In re Geoffrey and Rosemary DEASY, Debtors.**

**Neel Cotten, d/b/a Cotten Companies, Plaintiff,**

v.

**Geoffrey Deasy, Defendant.**

**Bankruptcy No. 01–33045 RCM–7. Adversary No. 01–3452.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 30, 2002.

Lawrence L. Beason, Mineola, TX, for Plaintiff.

Eric A. Liepins, Dallas, TX, for Defendant.

## MEMORANDUM OPINION

ROBERT C. MCGUIRE, Chief Judge.

This case was tried January 11, 2002. Neel Cotten, d/b/a Cotten Companies ("Plaintiff") sued Geoffrey Deasy ("Defendant" or "Debtor"), contending that his state court judgment was non-dischargeable under § 523(a)(6). The Court has core jurisdiction of this case under 28 U.S.C. §§ 1334 and 157(b)(2)(I).

Plaintiff is a real estate broker. On January 30, 1985, Plaintiff and Defendant entered into a one-year exclusive listing agreement for Plaintiff to sell approximately two acres of property belonging to Defendant and Charles Goodman, and located at 3504 Beltline Road in Dallas County, Texas. (Plaintiff's Exhibit "PX" 1). Such property was located two blocks south of the intersection of Beltline Road and Marsh Lane. The exclusive listing contract states: "If, during the term of this listing agreement, the property is sold, traded, exchanged, leased or in any other manner voluntarily disposed of by Owner, Owner will pay to REALTOR in Dallas County, Texas, a commission in cash as set forth above," i.e., 5%.

The contract was to expire on January 3, 1986. On December 27, 1985, Plaintiff wrote Defendant asking for an extension. On January 10, 1986, Defendant and Goodman wrote Plaintiff, acknowledging receipt of the December 27, 1985 correspondence (an attachment to PX 1), and authorized Plaintiff to continue to represent them until April 30, 1986, with the selling price reduced from $2,528,640 to $1,854,336 (the "Modification").

Plaintiff did not sign this instrument and there is no place on it for his signature. Exhibit B of PX 1 further provided that owner and realtor may extend the listing agreement and may modify its terms only by written agreement.

Plaintiff contends that Defendant executed a contract of sale with a Mr. Standley, on February 3, 1986, for a sale price of $1,685,000, with closing set for May 1, 1986, being one day after the extension terminated. Such alleged February 3, 1986 agreement was not offered into evidence.

On May 1, 1986, Defendant and Goodman closed a contract with Mr. Standley providing for sale of the property to Mr. Standley at a price of $1,685,000. The closing papers on the sale on May 1, 1986 were not offered into evidence.

Mr. Standley had no contact with Plaintiff on or prior to May 1, 1986.

Plaintiff testified that he worked the property prior to the extension by placing ads, sending flyers, and showing the property. Defendant contended that Plaintiff's services were minimal and that Plaintiff never produced a buyer. It appears that Plaintiff did perform services prior to the extension. Plaintiff never did obtain a written offer on the property. After the extension, Defendant contends that Plaintiff did little and that he never heard from Plaintiff. Plaintiff credibly testified that he continued to try to sell the property and that, from early 1986, Defendant would not return his calls.

Finally, on or about May 10, 1986, Plaintiff went to Defendant's offices to discuss the progress and was told by Defendant: "I guess I might as well tell you we sold

the property on May 1, 1986." Defendant told Plaintiff he would not pay him a commission.

Shortly thereafter, in 1986, Plaintiff filed suit against Defendant and Goodman. Defendant and Goodman initially obtained a summary judgment against Plaintiff on the basis that the listing contract was not extended and/or that the sale did not take place during the listing period. Neither side offered such summary judgment record into evidence.

In any event, such judgment was appealed and reversed by the Texas Court of Civil Appeals, and on remand, Plaintiff was granted a summary judgment. (PX 3). The appellate opinion on the reversal was not offered into evidence.

The final summary judgment offered into evidence denies Deasey and Goodman's counterclaim, but does not give any reasoning supporting the granting of Plaintiff's motion for summary judgment. At trial herein, there was no testimony concerning what factually was involved in such counterclaim. The judgment just says Plaintiff's motion for summary judgment is granted. Therefore, it is speculation as to the court's reasoning or findings on its conclusions of law. Presumably, the Plaintiff's motion for summary judgment, if available, might have supplied such information.

The summary judgment on remand was signed August 20, 1990 (PX 3), and granted Plaintiff a joint and several judgment against Defendant and Goodman for $84,250, pre-judgment interest of $20,586, plus stipulated attorney fees to such date of $41,500, for a total of $146,336.34, plus 10% interest thereon from January 18, 1990. Such judgment was appealed and affirmed on appeal. Any affirming Texas appellate opinion was not offered into evidence.

The foregoing findings are not intended as any criticism of the merits of the eventual state court judgment entered against Defendant. Same cannot be contested in this Court. To the extent relevant, the missing parts of the state court record might have cast some additional light on the state of mind of the Defendant in terms of whether the underlying commission dispute was frivolous or a good faith contractual dispute. The state court judge apparently, in the first instance, agreed with Defendant's defensive contentions, and then was reversed. It took Plaintiff $41,500 in attorney fees to overcome the merits of the legal contentions of the Defendant and Goodman before any judgment was obtained. (PX 2).

At trial before the undersigned, Defendant gave various explanations of why he did not pay Plaintiff's commission from the sale proceeds. He allegedly thought exclusivity expired before the contract with Standley closed. He claimed not to have read the contract before signing it. Further, while Standley was interested in purchasing the property, he needed financing which he supposedly did not get until May 1, 1986.

Standley also supposedly made his offer contingent upon Defendant immediately leasing the property at $22,500 per month for three years, and this was acceded to by Defendant in order to close the sale.

Further, Defendant supposedly was upset with Plaintiff because Plaintiff never produced a buyer. He further contended that Standley was the one that set a closing date on the contract.

### *Limitations*

■ There is a dispute about when Plaintiff first attempted to execute on the judgment against Defendant. Mr. Andress, Plaintiff's state court counsel, testified that post-judgment discovery was sought against Defendant, and then an

execution was returned as uncollectible. Debtor filed Chapter 7 on April 9, 2001, and Mr. Andress produced a writ of execution which he had issued by the clerk on February 15, 2001, and delivered to the constable on April 11, 2001. The constable returned the writ to Mr. Andress in view of the bankruptcy of Defendant. Plaintiff also testified, without any supporting documents, that Mr. Andress told him there was an execution prior to 2001.

Later, Mr. Andress testified (and he may have been confused) that the only execution he obtained was in 2001. Defendant contended that the ten-year statute of limitations bars this suit. Plaintiff's claim is not barred by limitations. It is unnecessary to decide whether an execution was issued within the first ten years, i.e., by August 20, 2000, because, in either event, the judgment became dormant before the April 2001 execution was issued. TEX. CIV. PRAC. & REM.CODE ANN. § 34.001 (Vernon 1997).[1]

■ The judgment is revived by this lawsuit since it is an "action of debt" within the meaning of TEX. CIV. PRAC. & REM. CODE ANN. § 31.006 (Vernon 1997), reading: "A dormant judgment may be revived by scire facias or by an action of debt brought not later than the second anniversary of the date that the judgment becomes dormant." The time for revival of this judgment has not passed since the second anniversary of the date the judgment became dormant is August 20, 2002. A new suit that is based on the original judgment and brought against the judgment debtor qualifies as "an action of debt" of a kind sufficient to revive the judgment under Texas law. *Penner v. Brints (In re Brints)*, 227 B.R. 94 (Bankr. N.D.Tex.1998).

### Res Judicata

Defendant contended that since Plaintiff's state court suit was not brought on fraud, then *res judicata* precluded him from bringing a § 523(a)(6) suit. This contention was answered in the negative in *Brown v. Felsen*, 442 U.S. 127, 138–39, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), and no further discussion of same is necessary.

### Collateral Estoppel

■ Plaintiff did not contend that collateral estoppel applied to the prior state court judgment except as to the ultimate amount awarded.

■ The essential elements of collateral estoppel under Texas law are that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action and the parties were cast as adversaries in the first action. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir.1998); *Smith v. Hayden (In re Hayden)*, 248 B.R. 519 (Bankr.N.D.Tex.2000). Other than establishing a monetary amount, the state court's judgment set forth no fact findings. If the Plaintiff is successful on his § 523(a)(6) claim, then it is undisputed in this case that the amount of the debt would be the same as found in conclusory form by the state court. *See also* Russell, *Bankruptcy Evidence Manual* § 21 (2002 ed.).

---

1. **§ 34.001. No Execution on Dormant Judgment**

(a) If a writ of execution is not issued within 10 years after the rendition of a judgment of a court of record or a justice court, the judgment is dormant and execution may not be issued on the judgment unless it is revived.

(b) If a writ of execution is issued within 10 years after rendition of a judgment but a second writ is not issued within 10 years after issuance of the first writ, the judgment becomes dormant. A second writ may be issued at any time within 10 years after issuance of the first writ.

### Section 523(a)(6)

In Plaintiff's petition and in the pretrial order, Plaintiff confined his contentions to the applicability of § 523(a)(6) to the facts of this case.

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor." A "willful" injury is defined as "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). An intentional injury, then, is defined as "an objective substantial certainty of harm or a subjective motive to cause harm." *In re Miller*, 156 F.3d at 606. This definition, by necessity, includes malice. *Id.*

In *State of Texas v. Walker*, 142 F.3d 813, 823–24 (5th Cir. May 1998), the court held that retention of a professional fee by a university professor/debtor against university policy might be an intentional injury under *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90, if the debtor kept the fees knowing that it would deprive the university of money to which it had rights. "[U]nder Texas law, a claim for breach of contract and the tort of conversion can arise from the same facts." *Nat'l Union Fire Ins. v. Care Flight Ambulance*, 18 F.3d 323, 326 (5th Cir.1994); *State of Texas v. Walker* 142 F.3d at 824.

"[A] plaintiff is not precluded from asserting a tort cause of action solely because his damages are analogous to the damages sought in a contractual claim." *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 674 (Tex.Civ.App.-Houston [1st Dist.] 1996).

In *Walker*, Walker was a heart surgeon at the University of Texas Health Science Center at Houston ("UTHSC"). As a condition of his employment, Walker joined the Medical Services Research and Development Plan ("MSRDP") by executing the standard contract in 1980.

While the procedural matters in *Walker* were complex, the § 523(a)(6) facts were relatively straight forward.

### I. Background

Prior to his termination, Walker filed for bankruptcy relief under Chapter 7 on September 1, 1992. His debts were discharged by the bankruptcy court on January 19, 1993. The University was not identified as a creditor in Walker's no-asset bankruptcy filing, and it did not file a proof of claim.

In February 1995, the State of Texas, by and through the Board of Regents of the University of Texas System and UTHSC ("State"), filed suit against Walker in state court. The State alleged conversion and breach of contract and sought an accounting of the fees retained by Walker.

142 F.3d at 815.

Counter–Defendants removed the case to federal court. On various cross-motions for summary judgment, the district court granted summary judgment to Walker, holding that the fees Walker retained prior to his filing bankruptcy were discharged. *Id.* at 816.

The State of Texas contended, on appeal, that the district court erred in holding Walker's retained fees dischargeable because it was a willful and malicious injury against the State of Texas. The Fifth Circuit remanded the case holding that a fact issue existed as to whether Walker's debt was dischargeable under § 523(a)(6). *Id.* at 819, 824. The Court's discussion of § 523(a)(6) issues can be found at pp. 823–24.

Neither a claim for breach of contract nor the tort of conversion necessarily

involves an intentional injury. See Kawaauhau, 523 U.S. at 61–62, 118 S.Ct. at 977.... [U]nder Texas law, a claim for breach of contract and the tort of conversion may arise from the same set of facts. *See Care Flight Air Ambulance Serv.*, 18 F.3d at 326.

\* \* \*

An issue of fact exists regarding whether Walker was aware of his obligations to the University under the MSRDP and nonetheless knowingly kept his professional fees with the intent of depriving the University of money owed to it.

\* \* \*

If a factfinder were to decide that Walker knew of his obligations under the MSRDP contract and its by-laws, either at the time he signed the contract or received the November 1990 memorandum, then it might also find that Walker knowingly retained his professional fees in violation of the MSRDP, an act which he knew would necessarily cause the University's injury. This, in turn, could result in a finding of "willful and malicious injury." Such factual issues must be submitted to a trier of fact in order to determine if Walker's debt was non-dischargeable under § 523(a)(6).

*Id.* at 823–24. From the foregoing *Walker* discussion, it appears that the Circuit was mainly concentrating on possible "conversion" by Walker as a § 523(a)(6) offense. Citing to similar Texas law, the court, in *Howard v. McWeeney (In re McWeeney)*, 255 B.R. 3, 8 n. 4 (Bankr.S.D.Ohio 2000), distinguishes the facts of that case from *Walker*. In *McWeeney*, the court granted summary judgment against the plaintiff, finding no conversion.

Under Ohio law an action for conversion of *money* arises only where: (1) there exists an obligation on the part of the defendant to deliver to the plaintiff specific money; and (2) the money is capable of identification.... Evidence supporting both elements of conversion must be present in order for a plaintiff to overcome a motion for summary judgement.

\* \* \*

Drawing all inferences from the evidence in a light most favorable to the plaintiff, as we must at this state of the proceedings, the Court finds that it fails to support the first element of conversion. A broken promise to pay a certain sum of money does not meet the stringent specific fund requirement for the establishment of a money conversion claim. Even if we were to conclude that the Plaintiff has offered sufficient proof as to create a material factual dispute regarding this element, we also find lacking any evidence buttressing the second element of the claim, namely that the funds converted are identifiable.

\* \* \*

Nor is there any evidence suggesting that McWeeney had an obligation to separate the specific funds and deliver those to Howard.... As a result, the receivables collected by McWeeney for Howard became McWeeney's property upon collection, and Howard possesses only a right to collect payment on a debt owed by McWeeney.

Howard argues strenuously, however, that the facts of this case are analogous to those in *State of Texas v. Walker*.

\* \* \*

Howard's reliance upon *Walker* is misplaced. In *Walker*, the debtor was a heart surgeon on the faculty of the University of Texas. As a condition of his employment, the debtor executed a con-

tract obligating him both to assign and deposit "all professional fees earned as a result of court appearances, depositions, or legal consultations" into a certain university account. After signing this contract, the debtor received considerable fees for such services and failed to remit them to the university. The university filed an action against the debtor in state court asserting, *inter alia,* a claim for conversion of the funds. The action was removed to federal court after which the district court awarded summary judgment to the debtor concluding that the debt related to the fees earned prior to the bankruptcy proceeding was discharged. As noted, the Fifth Circuit reversed and remanded the case for a factual determination of whether the debtor's retention of the fees constituted a "willful and malicious injury" under § 523(a)(6).

Although it is a close question, *Walker* is distinguishable from present case. There the contract, as interpreted by the Fifth Circuit, called for the assignment and deposit of the specific professional fees earned by the debtor into a particular university account established solely for that purpose.[4] In *Walker,* the debtor never had any right or claim to the identified fees in question, rather those specific funds, by contract, were entrusted to his care only long enough to be deposited into the university's account. If in this case, the parties' agreement had been shown to require that McWeeney was to hold the specific patient receipts in some fiduciary capacity for Howard, then Howard would have been the beneficial owner of those particular funds, and he would have been entitled to bring a conversion action.

\* \* \*

There has been no showing of any similar contractual obligation on the part of McWeeney to hold in trust those fees earned by Howard as there had been in *Walker* and *Bucyrus–Erie [Co. v. General Products Corp.,* 643 F.2d 413 (6th Cir.1981)]. Nor is there evidence demonstrating that McWeeney was required to hold those earnings separate. All that has been shown to exist is that there was an agreement for the fees generated from the services of both doctors to be deposited in the firm's general operating account and that Howard was to be paid from that account.

4. In Texas the standards for tortious conversion of money is very similar to that in Ohio. *See Newsome v. Charter Bank Colonial,* 940 S.W.2d 157, 161 (Tex.App.1996) ("Money is subject to conversion only when it can be identified as a specific chattel, and not where an indebtedness may be discharged y the payment of money generally. An action for conversion of money will lie where the money is (1) delivered fro safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by its keeper.") (citations omitted).

*In re McWeeney,* 255 B.R. at 5–8 (citations omitted) (footnotes omitted, except n. 4). Other Texas cases concerning conversion of money support the propositions set forth in *Newsome v. Charter Bank Colonial,* 940 S.W.2d at 161 (cited in *In re McWeeney,* 255 B.R. at 8 n. 4, and quoted above); *Phippen v. Deere & Co.,* 965 S.W.2d 713, 724 (Tex.App.-Texarkana 1998).

 Failure to pay the Plaintiff's commission is not a conversion in Texas. No money representing the commission was delivered to Defendant for safekeeping; the commission was not intended to be kept segregated from the purchase price substantially in the form in which it was received or as an intact fund; and it would not be subject to a title claim by the keeper. *Newsome v. Charter Bank Colonial,* 940 S.W.2d at 161. "Money is sub-

ject to conversion only when it can be identified as a specific chattel, and not where an indebtedness may be discharged by the payment of money generally." *Id.*

Debtor never exercised control over the sales proceeds inconsistent with any ownership by Plaintiff in the sales proceeds because Plaintiff had no ownership in such sales proceeds.

In discussing § 523(a)(4) in the context of a jury finding on misappropriating proprietary information, the Fifth Circuit pointed out that, for a breach of fiduciary relationship, there had to be an intent to defraud. *In re Miller*, 156 F.3d at 603. The court went on to say:

> The jury's finding that Miller acted wrongfully in misappropriating or misusing Abrams's proprietary information does not include a finding of fraudulent intent. *One can wrongfully appropriate a trade secret while acting under an erroneous belief of entitlement.* The question to the jury did not decide intent. Nor did the judgment entered on the verdict since intent was not essential to the judgement. Without such a finding by the state courts, there is no preclusion.

*Id.* (emphasis added). In discussing § 523(a)(6), the *Miller* court explained:

> The "just cause or excuse" approach is peculiarly inappropriate, however, given the Supreme Court's definition of "willful ... injury" in *Kawaauhau*. Where injury is intentional, as it now must be under *Kawaauhau*, it cannot be justified or excused. Eliminating the "just cause or excuse" exception would not ensnare those who have *acted under "an honest, but mistaken belief."* Such an individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of "not substantially certain to result," in the

absence of the fact about which there has been mistake.

*Id.* at 606 (emphasis added).

Defendant apparently believed that he had a legitimate basis of defense. In the first instance, the trial court found Defendant's contentions valid in granting Defendant's summary judgment, *i.e.*, that the Standley contract in question was after the expiration of the listing extension or that the extension was not entered into. Additionally, Defendant apparently felt that his leaseback arrangement with Standley was a new wrinkle not previously contemplated by the parties, causing him, in effect, to finance the Standley purchase price.

While not produced, it appears that there must have been a Standley contract of sale entered into before May 1, 1986, which was conditional on Standley obtaining financing. On remand, the state court must have been convinced that, either the parties intentionally delayed the sale date to avoid the commission, or that the wording in the exclusive sale contract bound Debtor to pay the commission because the date of the contract of sale was the important date, in defining "sold" under the exclusive listing contract quoted above, not the date of the actual closing on May 1, 1986.

Under the "conversion" or "duty to speak" cases argued by Plaintiff, it appears that, under the facts found, such theories are not applicable to the § 523(a)(6) offense alleged by Plaintiff. The "duty to speak" cases normally arise in the context of a § 523(a)(2)(A) offense. *AT & T Universal Card Serv. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir.2001).

Additionally, aside from such theories, and assuming for argument sake that a breach of the listing contract by Defendant could otherwise constitute a § 523(a)(6) offense, Plaintiff failed to prove, by a pre-

ponderance of the evidence,[2] that Plaintiff's breach of the contract was done with either an objective substantial certainty of harm to Plaintiff, or the subjective motive to cause harm to Plaintiff. *In re Miller,* 156 F.3d at 606.

Plaintiff also argued that Debtor let him work after entering into a contract with Standley. To the extent this involves some type of separate *quantum meruit* § 523(a)(6) claim (*i.e.,* exclusive of the listing contract), one generally cannot recover on *quantum meruit* if he has an express contract. Secondly, even if a variant of a *quantum meruit* claim were somehow available as a § 523(a)(6) offense, no § 523(a)(6)-type damages were proven for such post-January, 1986 activity of Plaintiff.

Some other cases in this area will be discussed briefly to complete the record. In the case of *N.I.S. Corp. v. Hallahan (In re Hallahan),* 936 F.2d 1496, 1501 (7th Cir.1991), the court upheld the lower court's finding of debtor's admitted willful breach of a non-competition covenant as a § 523(a)(6) offense. To the same effect, *see Traditional Indus., Inc. v. Ketaner (In re Ketaner),* 149 B.R. 395 (Bankr.E.D.Va. 1992). In the course of such opinion, the court held that "[s]imply being able to construct a legal argument to support one's actions is insufficient to invoke the protection provided for in *[In re] Murray* [116 B.R. 473 (Bankr.E.D.Va.1990)]" (*Id.* at 401), *i.e.,* reliance in good faith upon counsel's opinion as a defense.

In an unpublished opinion, the Tenth Circuit upheld a § 523(a)(6) lower court opinion in *Sanders v. Vaughn (In re Sanders),* 210 F.3d 390, 2000 WL 328136 (10th Cir.2000).[3] In such case, the debtor Sand-

ers hired Vaughn as his attorney on a contingency basis before the IRS to get a tax refund. After learning that the IRS was willing to give him a $30,000 refund, he revoked Vaughn's power of attorney and took the money without paying Vaughn. The lower court found that Sander's deliberate attempt to bilk Vaughn out of the contingency fee constituted a § 523(a)(6) offense, and the Tenth Circuit upheld same. Such facts appear closer to the *Walker*-type conversion case (142 F.3d 813) because the fund was in Vaughn's control by virtue of his power of attorney which was revoked by Sanders. Further, there was apparently no dispute about the merits of the obligation.

---

**2.** *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**3.** It is recognized that, generally, unpublished opinions cannot be cited as authority even though the logic or fact situation may be similar to an issue being considered.