IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-50842

---

In The Matter Of:  WILLIAM L MILLER

Debtor,

WILLIAM L MILLER

Appellant,

versus

J.D. ABRAMS INCORPORATED

Appellee.

---

Appeal from the United States District Court
for the Western District of Texas

---

September 24, 1998

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Miller appeals the district court's order holding that the state court judgment debt Miller owes J.D. Abrams, Inc., is nondischargeable in bankruptcy.  More specifically, Miller contests the district court's conclusion that he is precluded under the doctrine of collateral estoppel from trying in the bankruptcy court the issue necessary to decide the dischargeability question.  We

conclude that neither the state court jury nor the state trial judge in entering judgment on the verdict decided Miller's intent in misappropriating or misusing Abrams's proprietary information. We REVERSE the district court's judgment and REMAND for further proceedings.

I

Abrams, a successful Texas highway and road contractor, employed Miller from June 1985 until February 28, 1994, when Miller left his position as vice president and director at Abrams to become manager and chief operations officer of Belfour Beatty, Inc.'s highway division. In his position at Abrams, Miller was privy to proprietary information and trade secrets regarding such matters as management policies, customer lists, pricing and bidding strategies, and profit margins and cost projections on specific projects. Belfour, wanting to start a competing highway division, started recruiting Miller. During a series of meetings concerning his prospective employment, Miller disclosed confidential information and trade secrets of Abrams to Belfour agents. Based on the information Miller divulged and his twenty years of experience in the road construction industry, Belfour offered Miller the COO position. Other employees of Abrams accompanied Miller in his move to Belfour.

On April 18, 1994, Abrams filed suit in Texas state court against Miller and Belfour. The case was tried to a jury in

2

November 1995. The jury found that Miller misappropriated proprietary information or misused trade secrets and awarded Abrams damages of $1 million. The jury also decided that Miller had not breached any fiduciary duties owed Abrams and that punitive damages were not appropriate, since Miller did not act with "malice mean[ing] ill will, evil motive, or flagrant disregard for the rights of others."

Miller filed a voluntary Chapter 7 bankruptcy petition seeking protection from the state court judgment. Abrams instigated an adversary proceeding to obtain a determination that the state court judgment was a nondischargeable debt under 11 U.S.C. §§ 523(a)(4) and 523(a)(6). Based on the doctrine of collateral estoppel, the bankruptcy court granted summary judgment in favor of Abrams. The state court judgment, it found, was nondischargeable under § 523(a)(4) since misappropriation of proprietary information was larceny per se. The bankruptcy court, however, declined to rest its summary judgment on § 523(a)(6), because the court believed that the state court jury had not decided whether Miller had inflicted a "willful and malicious injury," the requirement for nondischargeability under that section. Miller and Abrams both appealed.

The district court affirmed the judgment that the state court judgment was nondischargeable based on principles of collateral estoppel. The district court, after analyzing the § 523(a)(6) issue, stated that "[t]he bankruptcy judge was correct in finding

3

that the judgment debt was nondischargeable on behalf of Miller by collateral estoppel." As we explained, the bankruptcy judge did not rest its grant of summary judgment upon § 523(a)(6). From context, though, it is clear that the district court found that the debt was also nondischargeable under § 523(a)(4). In doing so, the district court pointed to the jury's finding that Miller had misappropriated proprietary information or misused trade secrets for his own advantage to the detriment of Abrams. The district court believed that this finding conclusively determined that Miller had inflicted a "willful and malicious injury" on Abrams for purposes of § 523(a)(6).

The district court also stated that "[t]he bankruptcy judge was further correct in failing to find the nondischargeability of the judgment debt pursuant to 11 U.S.C. § 523(a)(4) and was correct in overruling all of the contentions with the appellant Miller with regard to his contentions on finding the judgment debt dischargeable based upon collateral estoppel." The efforts to parse the language of the district court aside, it is clear that the judgment entered by the district court found the state court judgment to be a nondischargeable debt.

We have jurisdiction under 28 U.S.C. § 158(d).

II

We review summary judgment rulings de novo applying the same standards as did the lower courts. See In re Hudson, 107 F.3d 355,

4

356 (5th Cir. 1997). We also review <u>de novo</u> a "'court's decision to give full faith and credit to [a] state court judgment.'" <u>In re Garner</u>, 56 F.3d 677, 679 (5th Cir. 1995) (quoting <u>Sanders v. City of Brady</u>, 936 F.2d 212, 217 (5th Cir.), <u>cert. denied</u>, 502 U.S. 1013 (1991)).

Since the judgment against Miller was rendered by a Texas state court, this court must apply Texas rules of preclusion. <u>See</u> 28 U.S.C. § 1738 (full faith and credit statute); <u>Matsushita Elec. Indus. Co. v. Epstein</u>, 516 U.S. 367, 373 (1996); <u>In re Garner</u>, 56 F.3d at 679. "Under Texas law, collateral estoppel 'bars relitgation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action.'" <u>In re Garner</u>, 56 F.3d at 679 (quoting <u>Bonniwell v. Beech Aircraft Corp.</u>, 663 S.W.2d 816, 818 (Tex. 1984)).

> Further, Texas law requires that:
> A party seeking to invoke the doctrine of collateral estoppel must establish (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

<u>Id.</u> at 680 (quoting <u>Bonniwell</u>, 663 S.W.2d at 818). Miller and Abrams agree that requirement (3) is met, but disagree on the degree to which the issue of Miller's intent was litigated in and essential to the state court action.

5

The scope of the collateral estoppel doctrine is circumscribed by the particularized findings of the jury. See Marine Shale Processors, Inc. v. EPA, 81 F.3d 1371, 1379 (5th Cir. 1996) (Higginbotham, J.). In this case, the jury specifically answered in the affirmative, with respect to Miller, the question: "Did any of the defendants misappropriate proprietary information or make an improper use of the trade secrets of J.D. Abrams, Inc.?" Misappropriation was defined as the "wrongful taking and use of another's property." The jury answered in the negative whether Miller had acted with "malice mean[ing] ill will, spite, evil motive, or flagrant disregard for the rights of others." Based on these answers, we must decide whether the jury decided whether Miller acted with the mental state required to satisfy either § 523(a)(4) or § 523(a)(6). We conclude that it made no such decision.

III

Under 11 U.S.C. § 523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may not be discharged in bankruptcy. In construing this section, this court has stated that this discharge exception "was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that

6

is not the debtor's." In re Boyle, 819 F.2d 583, 588 (5th Cir. 1987).

The jury found that Miller had not breached any fiduciary duty owed Abrams. While the definition of "fiduciary" under § 523(a)(4) is controlled by federal common law rather than Texas law, it is clear that the federal common law definition is even narrower than the Texas definition. As this court noted recently, "[T]he concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law. Under § 523(a)(4), 'fiduciary' is limited to instances involving express or technical trusts." Texas Lottery Comm'n v. Tran, No. 97-20383, 1998 WL 480152, at *2 (5th Cir. 1998). The instruction given to the jury in the state case here was far broader, noting that "implicit in this duty is that an officer or director may not serve his own personal interest at the expense of the corporation and its stockholders." Because the federal standard will never identify a "fiduciary" where Texas law would not, the state court judgment is issue preclusive with respect to whether there was "fraud or defalcation while acting in a fiduciary capacity."

The § 523(a)(4) exception to discharge, however, may still apply here if Miller's actions constitute "embezzlement" or "larceny." Since Miller came into possession of Abrams's proprietary information and trade secrets lawfully, embezzlement, rather than larceny, is the § 523(a)(4) term which applies. See Great Am. Ins. Co. (In re Graziano), 35 B.R. 589, 594 (E.D.N.Y.

7

1983). Embezzlement is defined for purposes of § 523(a)(4) as the "'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" Greyhound Lines Inc. v. Thurston (In re Thurston), 18 B.R. 545, 550 (M.D. Ga. 1982) (quoting 3 Collier on Bankruptcy ¶ 523.14(3), 523-106 (15th ed. 1981)).

The discharge exceptions are to be narrowly construed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start. See Tran, 1998 WL 480152, at *2. To meet the definition of "embezzlement," there must be proof of the debtor's fraudulent intent in taking the property. See Brady v. McAllister (In re Brady), 101 F.3d 1165, 1173 (6th Cir. 1996) ("A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."); In re Sokol, 170 B.R. 556, 560 (Bankr. S.D.N.Y. 1994); cf. Coburn Co. v. Nicholas, 956 F.2d 110, 111 (5th Cir. 1992) (requiring an intent to defraud for a determination of whether there has been a breach of a fiduciary relationship under § 523(a)(4)).

The jury's finding that Miller acted wrongfully in misappropriating or misusing Abrams's proprietary information does not include a finding of fraudulent intent. One can wrongfully appropriate a trade secret while acting under an erroneous belief of entitlement. The question to the jury did not decide intent. Nor

8

did the judgment entered on the verdict since intent was not essential to the judgement. Without such a finding by the state courts, there is no preclusion.

IV

Under the Bankruptcy Code, a debtor may not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Although we will ultimately conclude that under recent Supreme Court precedent, "willful and malicious injury" is a unitary concept entailing a single two-pronged test, courts have previously analyzed "willful" and "malicious" separately. We thus consider them here in turn.

A.

The Supreme Court recently answered the "pivotal question" of whether § 523(a)(6) covers "acts, done intentionally, that cause injury . . . or only acts done with the actual intent to cause injury." Kawaauhau v. Geiger, 118 S. Ct. 974, 977 (1998). The Court's conclusion was that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Id. This conclusion was similar to one that the Fifth Circuit had reached in analyzing § 523(a)(6). In Corley v. Delaney (In re Delaney), 97 F.3d 800 (5th Cir. 1996), this court reaffirmed its earlier holding that "for willfulness and malice to prevent discharge under § 523(a)(6), the

9

debtor must have intended the actual injury that resulted" and not just performed an intentional act that resulted in injury. Id. at 802.

Before we can determine whether the findings of the jury in the state court conclusively determine whether Miller inflicted a "willful . . . injury," we must grasp the Supreme Court's insistence on "actual intent to cause injury." The Supreme Court's disposition in Kawaauhau certainly eliminates the possibility that "willful" encompasses negligence or recklessness. See Kawaauhau, 118 S. Ct. at 978 ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

At least three remaining readings are possible. The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury. We hold that the label "intentional tort" is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful . . . injury" in § 523(a)(6).

If "actual intent to cause injury" and intentional torts were parallel terms, issue preclusion with respect to willfulness would apply in favor of Abrams. This is because misappropriation of proprietary information and misuse of trade secrets are generally

10

considered to be intentional torts. See, e.g., Micro Data Base Sys., Inc. v. Drarma Sys., Inc., Nos. 97-2989 & 97-3138, 1998 WL 272761, at *4 (7th Cir. 1998) (Posner, C.J.) ("The misappropriation of a trade secret is an intentional tort."); Restatement (Third) Unfair Competition § 40(b) (defining the scienter requirement for misuse of trade secrets); see also Hyde Corp. v. Huffines, 314 S.W.2d 763, 769 (Tex. 1958) (relying on a similar predecessor Restatement definition in defining misuse of trade secrets); American Derringer Corp. v. Bond, 924 S.W.2d 773, 777 (Tex. Ct. App.--Waco 1996, no writ) (following Hyde).

The category of intentional torts, however, is broader. The Supreme Court did specifically refer to intentional torts, noting that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." Kawaauhau, 118 S. Ct. at 977. This acknowledgment of a logical association, however, avoids equating § 523(a)(6) torts and intentional torts, and with good reason.

Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful. This case illustrates the distinction, since misappropriation of proprietary information and misuse of trade secrets are wrongful regardless of whether injury is substantially certain to occur. See, e.g., Restatement (Third) Unfair Competition § 40(b) cmt. c ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use'

11

under this section."). Misuse of trade secrets is not precisely like stealing funds from a till, because the tortfeasor's gain is not inevitably a loss to the legal owner of the secret.

Most often, an intentional tort requires either objective substantial certainty of harm or subjective motive to do harm. Indeed, the presence of one of these factors is both necessary and sufficient for a tort to be classified as an "intentional tort" under the traditional modern definition. See Kenneth J. Vandevelde, A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort, 19 Hofstra L. Rev. 447, 447 (1990) (describing "intentional torts" as those where "the defendant acted with the intent to injure the plaintiff or with substantial certainty that his action would injure the plaintiff").

Thus, rather than allow the general classification of a tort to be a talisman, we hearken back to this original definition of "intentional tort" to determine whether injury is "willful" for § 523(a)(6) purposes. This test is fully consistent with our precedent. Delaney, which remains good law because the Supreme Court in no way contradicted it, equated intending actual injury to a situation in which "the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." Delaney, 97 F.3d at 802. Although Delaney did not address whether a subjective motive to injure would alternatively be sufficient to trigger § 523(a)(6), it would seem peculiar to deem

12

an action causing injury not "willful" when the tortfeasor's action was in fact motivated by a desire to cause injury.

Applying this test, we find that willful injury was not decided in the state court suit. If the subjective standard alone were the standard, issue preclusion would give Miller victory because the jury found that he did not act with "malice," defined by the court to include "evil motive." Miller's conduct, however, could still be "willful" under the objective standard, if his acts were substantially certain to result in injury to Abrams. The state court jury determined only that injury was proximately caused by Miller's acts, a less demanding standard than "substantial certainty."

### B.

Miller's claim of preclusion might still seem to be vital, because § 523(a)(6) requires "willful <u>and malicious</u> injury" (emphasis added). If Miller could establish that the state court decided that his acts were not "malicious," § 523(a)(6) would not bar dischargeability. At first glance, Miller might appear to meet this burden, since the jury found no act of malice by Miller in determining whether to assess punitive damages. Unfortunately for Miller, however, the meaning of "malicious" in § 523(a)(6) is controlled by federal law rather than state law. To determine whether the definitions are sufficiently similar that the trial of one is a trial of the other requires that we define "malicious."

13

The law outside the Fifth Circuit concerning the meaning of "malicious" in § 523(a)(6) has long been confused. See generally Firstmark Fin. Corp. v. Aldrich (In re Aldrich), 37 B.R. 860, 862–64 (Bankr. N.D. Ohio); Charles Jordan Tabb, The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate, 59 Geo. Wash. L. Rev. 56, 61-89 (1990); Karen N. Fischer, Comment, The Exception to Discharge for Willful and Malicious Injury: The Proper Standard for Malice, 7 Bankr. Dev. J. 245, 248-59 (1990).

Courts have divided roughly into two camps, some requiring "special malice," which requires a showing of a motive to harm, and others requiring merely "implied malice." Compare, e.g., American Savings & Loan Ass'n v. Weber (In re Weber), 99 B.R. 1001, 1014-15 (Bankr. D. Utah 1989) (requiring special malice), and Grand Piano & Furniture Co. v. Hodges (In re Hodges), 4 B.R. 513, 516 (Bankr. W.D. Va. 1980) (same), with United Bank v. Nelson, 35 B.R. 766, 774 (N.D. Ill. 1983) (requiring "implied malice"), and United Va. Bank v. Fussell (In re Fussell), 15 B.R. 1016, 1022 (W.D. Va. 1981) (same). The difference in opinion has been whether § 523(a)(6) repudiated an implied malice test previously established in Tinker v. Colwell, 193 U.S. 473 (1904).

The Fifth Circuit so far has taken a clear path, albeit without analysis of the confused jurisprudence. Vickers v. Home Indem. Co., 546 F.2d 1149 (5th Cir. 1977), defined "malicious" as "'without just cause or excuse.'" Id. at 1150 (quoting 1A Collier,

14

Bankruptcy ¶ 17.17, at 1650.4 to 1650.6 (1976)); <u>see also</u> <u>Corley v. Delaney (In re Delaney)</u>, 97 F.3d 800, 802 n.6 (5th Cir. 1996); <u>Seven Elves, Inc. v. Eskenazi</u>, 704 F.2d 241, 245 (5th Cir. 1983); <u>Petty v. Dardar (In re Dardar)</u>, 620 F.2d 39, 40 (5th Cir. 1980).

This test is thus a species of "implied malice," because no bad motive on the part of the debtor is required. <u>See, e.g.</u>, <u>Black's Law Dictionary</u> 958 (6th ed. 1990) (defining "implied malice" for general purposes as "[m]alice inferred by legal reasoning and necessary deduction from the res gestae or the conduct of the party."). Other courts, however, have defined "implied malice" differently. <u>See, e.g.</u>, <u>In re Nance</u>, 556 F.2d 602, 611 (1st Cir. 1977) ("There need be no showing of 'special malice' toward the injured party, only that the act is done deliberately and intentionally, in knowing disregard of the rights of another.") (internal quotation marks omitted). This definition makes the "implied malice" inquiry quite close to that of the <u>Kawaauhau</u> standard for "willful . . . injury."

Ordinarily, of course, this court would be bound to its precedent, and thus would retain the "just cause or excuse" definition. The Supreme Court's decision in <u>Kawaauhau</u>, however, has displaced it. The origin of the "just cause or excuse" standard is <u>Tinker</u>, 193 U.S. at 487, but the <u>Kawaauhau</u> Court, after specifically quoting the "just cause or excuse" and other language, criticized that opinion as failing to produce a clear standard. <u>See</u> 118 S. Ct. at 978 ("The exposition in the <u>Tinker</u> opinion is less

15

than crystalline."). More importantly, the <u>Kawaauhau</u> Court explicitly confined the holding of <u>Tinker</u> to the collateral proposition that criminal conversation is an intentional tort. <u>See id.</u>

Thus, the roots of the "just cause or excuse" standard that this court has adopted have now been cut off. The most obvious candidates are the "special malice" and the "implied malice" standards on which most courts have focused. The "special malice" standard has been criticized for "appear[ing] to abolish section 523(a)(6) of the Code as a meaningful ground of nondischargeability." <u>Citizens Bank & Trust Co. v. Lewis (In re Lewis)</u>, 17 B.R. 46, 48 (Bankr. W.D. Ark. 1981). While a special malice standard might still have bite for judgments involving torts like battery, it would make nondischargeability unnecessarily rare, as judgments for torts substantially certain or certain to result in injury would be discharged when a tortfeasor was merely indifferent to the injury and not acting with the end goal of causing that injury.

The implied malice standard is thus preferable. This still leaves the question of which variant of the implied malice definition is appropriate. "Without just cause or excuse" might serve as a useful general definition of implied malice, and it might have been an appropriate definition when it appeared that "willful . . . injury" might include negligent acts or acts based on mistakes of fact. This is because when a tort does not involve

16

intentional injury to another, then it might in some circumstances be justified or excused. <u>See, e.g.</u>, <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 332 (1934) ("There may be an honest, but mistaken belief engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.").

The "just cause or excuse" approach is peculiarly inappropriate, however, given the Supreme Court's definition of "willful . . . injury" in <u>Kawaauhau</u>. Where injury is intentional, as it now must be under <u>Kawaauhau</u>, it cannot be justified or excused. Eliminating the "just cause or excuse" exception would not ensnare those who have acted under "an honest, but mistaken belief." Such an individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of "not substantially certain to result," in the absence of the fact about which there has been mistake.

Thus, we adopt the alternative definition of "implied malice." Because this standard is synonymous to the <u>Kawaauhau</u> standard for "willful injury," "acts done with the actual intent to cause injury," <u>id.</u> at 975, we hold that this is the test for "willful and malicious injury" under § 523(a)(6). Thus, we hold that an injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause harm.

<u>Kawaauhau</u> does not foreclose, even encourages, this approach. That case never makes explicit whether it is analyzing solely the

17

"willful" prong or the "willful and malicious" standard as a unit. Aggregating "willful and malicious" into a unitary concept might be inappropriate if the word they modified were "act," but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is "injury."

It is worth noting that this interpretation of § 523(a)(6) comes quite close to that recommended by commentators who, pre-Kawaauhau, have considered the definition of "malicious." See Tabb, supra, at 104 (propounding a "knowing violation" test, wherein the debtor must have been aware that its act violated the legal rights of the creditor); Fischer, supra, at 258-59 ("The critical inquiry under this standard is whether the debtor knew, or should have known, that his actions would cause harm to the creditor.").

Applying this analysis to the instant case is straightforward. The word "malicious" does not change the conclusion. Thus, on the § 523(a)(6) claim, we find that issue preclusion does not apply in favor of either party. If Miller's actions were at least substantially certain to result in injury to Abrams, then the debt is nondischargeable under § 523(a)(6). Otherwise, neither the objective nor the subjective standard is met, and the debt is dischargeable.

V

Since the jury's findings in the state court did not speak to whether Miller acted with fraudulent intent or the objective probability of injury from Miller's tortious acts, the parties are

18

free to try this issue for the first time.  Accordingly, we REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion, including entry of summary judgment on the facts if appropriate.