**In re Bonnie D. BEHN, Debtor.**

**Buffalo Gyn Womenservices, Inc., Plaintiff,**

v.

**Bonnie D. Behn, Defendant.**

**Bankruptcy No. 99–11231 K.**
**Adversary No. 99–1165 K.**

United States Bankruptcy Court,
W.D. New York.

Dec. 1, 1999.

See also 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1, 799 F.Supp. 1417, 848 F.Supp. 400.

Glenn E. Murray, Buffalo, NY, for plaintiff.

Denis A. Kitchen, Jr., Williamsville, NY, for debtor/defendant.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This is the Plaintiff's Summary Judgment motion, opposed by the Debtor. In addition to presenting a dischargeability issue that is of great importance to the parties, this action under 11 U.S.C. § 523(a)(6) is a footnote to history. The Debtor is one of many named defendants in the civil action that led to the United States Supreme Court's decision in *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), wherein the High Court upheld fixed "buffer zones" outside the premises of providers of abortion services, but struck down "floating bubble zones" of protection around individuals as they sought access to the providers.

At issue here is whether the Debtor's violation of the Temporary Restraining Order discussed in the seventh paragraph below, and the resulting $35,000[1] sanction awarded by the District Court to the Plaintiffs, arose from a "willful and malicious" injury caused by the Debtor.[2] But more precisely, the question is whether the Debtor is entitled to try that matter now, or whether the Plaintiff may rest upon what was decided in the District Court. This Court finds that the Plaintiff may rest on the District Court proceedings. The Debtor is not entitled to another day in court. The Court will order judgment for the Plaintiff.

## BACKGROUND

The United States Supreme Court set forth the background of the case as follows:

1. $10,000 in civil damages for contempt, plus $25,260.16 in attorneys' fees and costs.

2. Although it was the Debtor's activity in a "floating bubble zone" that is at issue here, the governing order was, at the time in question, a stipulated extension of a Temporary Restraining Order. No issue is presented here as to the effect of the subsequent Supreme Court ruling.

Respondents [including the Plaintiff here] include three doctors and four medical clinics (two of which are part of larger hospital complexes) in and around Rochester and Buffalo in upstate New York. These health care providers perform abortions and other medical services at their facilities. The eighth respondent is Pro–Choice Network of Western New York, a not-for-profit corporation dedicated to maintaining access to family planning and abortion services.

On September 24, 1990, respondents filed a complaint in the District Court for the Western District of New York against fifty individuals [including the Debtor here] and three organizations—Operation Rescue, Project Rescue Western New York, and Project Life of Rochester. The complaint alleged that defendants had consistently engaged in illegal blockades and other illegal conduct at facilities in the Western District of New York where abortion were performed. (For convenience, we refer to these facilities as "clinics" throughout.) The complaint alleged one federal and six state causes of action: conspiracy to deprive women seeking abortions or other family planning services of the equal protection of the laws, in violation of Rev. Stat. § 1980, 42 U.S.C. § 1985(3); discrimination against any harassment of women seeking abortions and other family planning services, in violation of N.Y. Civ. Rights Law § 40–c (McKinney 1992) and N.Y. Exec. Law § 296 (McKinney 1993); trespass; tortious interference with business; tortious harassment; false imprisonment; and intentional infliction of emotional harm. The complaint alleged that a large blockage was planned for September 28, and requested that the court issue a temporary restraining order (TRO) to stop it. The complaint also sought a permanent injunction and damages.

Before the complaint was filed, the clinics were subject to numerous large-scale blockades in which protesters would march, stand, kneel, sit, or lie in parking lot driveways and in doorways. This conduct blocked or hindered cars from entering clinic parking lots, and patients, doctors, nurses, and other clinic employees from entering the clinics.

In addition to these large-scale blockades, smaller groups of protesters consistently attempted to stop or disrupt clinic operations. Protesters trespassed onto clinic parking lots and even entered the clinics themselves. Those trespassers who remained outside the clinics crowded around cars or milled around doorways and driveway entrances in an effort to block or hinder access to the clinics. Protesters sometimes threw themselves on top of the hoods of cars or crowded around cars as they attempted to turn into parking lot driveways. Other protesters on clinic property handed literature and talked to people entering the clinics—especially those women they believed were arriving to have abortions—in an effort to persuade them that abortion was immoral. Sometimes protesters used more aggressive techniques, with varying levels of belligerence: getting very close to women entering the clinics and shouting in their faces; surrounding, crowding, and yelling at women entering the clinics; or jostling, grabbing, pushing, and shoving women as they attempted to enter the clinics. Male and female clinic volunteers who attempted to escort patients past protesters into the clinic were sometimes elbowed, grabbed, or spit on. Sometimes the escorts pushed back. Some protesters remained in the doorways after the patients had entered the clinics, blocking others from entering and exiting.

On the sidewalks outside the clinics, protesters called "sidewalk coun-

selors" used similar methods. Counselors would walk alongside targeted women headed toward the clinics, handing them literature and talking to them in an attempt to persuade them not to get an abortion. Unfortunately, if the women continued toward the clinics and did not respond positively to the counselors, such peaceful efforts at persuasion often devolved into "in your face" yelling, and sometimes into pushing, shoving, and grabbing. Men who accompanied women attempting to enter the clinics often became upset by the aggressive sidewalk counseling and sometimes had to be restrained (not always successfully) from fighting with the counselors.

The District court found that the local police had been "unable to respond effectively" to the protests, for a number of reasons: the protests were constant, overwhelming policy resources; when the police arrived, the protesters simply dispersed and returned later; prosecution of arrested protesters was difficult because patients were often reluctant to cooperate for fear of making their identify public; and those who were convicted were not deterred from returning to engage in unlawful conduct. In addition, the court found that defendants harassed the police officers verbally and by mail, including the deputy police chief. Also harassed were people who testified against the protesters. This, testified the deputy policy chief, "made it more difficult for him to do his job." *Pro–Choice Network of Western N.Y. v. Project Rescue Western N.Y.*, 799 F.Supp. 1417, 1426–1427 (W.D.N.Y.1992). See also *id.*, at 1431. ("[T]here has been substantial uncontradicted evidence that defendants' activities are intended, and do in fact, prevent and hinder local police from protecting the right of women to choose to have an abortion").

On September 27, 1990, three days after respondent filed their complaint and one day before the scheduled large-scale blockade, the District Court issued a TRO. The parties stipulated that the TRO might remain in force until decision on respondents' motion for a preliminary injunction. In pertinent part, the TRO enjoined defendants [including the Debtor here] from physically blockading the clinics, physically abusing or tortiously harassing anyone entering or leaving the clinics, and "demonstrating within 15 feet of any person" entering or leaving the clinics. As an exception to this 15–foot "buffer zone" around people, the TRO allowed two sidewalk counselors to have a "conversation of a nonthreatening nature" with individuals entering or leaving the clinic. If the individuals indicated that they did not want the counseling, however, the counselors had to "cease and desist" from counseling.[1]

---

1. Although the TRO (and the preliminary injunction) states that the "cease and desist" provision is triggered whenever the individual "wants to not have counseling," the District Court has construed this provision to apply only if "the targeted person or group of persons indicates, either verbally or non-verbally, that they do not wish to be counseled." 799 F.Supp., at 1434. See also 67 F.3d 377, 391 (C.A.2 1995) (same).

Schenk, 519 U.S. at 361–64, 117 S.Ct. 855.

On August 14, 1992, the District Court (Hon. Richard J. Arcara, U.S.D.J.) entered one of the two Decisions and Orders in *Pro–Choice Network of Western New York v. Project Rescue Western New York*, that is here sought to be declared nondischargeable. See No. 90–CVA–1004A (W.D.N.Y. August 14, 1992). After describing the background in terms similar to the above, the District Court described the Debtor here and others, the TRO, and the Debtor's actions, as follows:

Defendants in the main action include three organizations, Project Rescue Western New York, Operation Rescue and Project Life of Rochester,

and 50 individuals, including Bonnie Behn and Carla Rainero. They are opposed to abortion and dedicated to the "pro-life" movement. Plaintiffs allege that defendants have been engaged in a consistent pattern of illegal conduct at plaintiffs' health care facilities including blockading access to and egress from their facilities, trespassing, and harassment and intimidation of their patients and staff.

Plaintiffs commenced the main action on September 24, 1990. Immediately upon filing their complaint, plaintiffs moved for a TRO, pursuant to Fed.R.Civ.P. 65(b), to enjoin a "blockade" that defendants had announced for September 28, 1990. The location of the blockade was to be kept secret until the morning it was scheduled to occur. On September 26, 1990, the Court conducted a hearing and heard argument on the TRO motion. On September 27, 1990, after hearing further argument from plaintiffs' counsel and some of the named defendants, and after reviewing the complains and supporting affidavits, the Court, following *New York State NOW v. Terry,* 704 F.Supp. 1247 (S.D.N.Y.), *aff'd,* 886 F.2d 1339 (2d Cir. 1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), issued a TRO (a copy of which is attached hereto as an Appendix) enjoining defendants from conducting any "blockade" of plaintiffs' abortion facilities and from harassing patients and staff entering or existing the facilities.

Defendants complied with the TRO by holding a peaceful demonstration, rather than a full-fledged blockade, on September 28, 1990. The Court then scheduled a hearing for October 4, 1990, in order to determine whether the TRO should be converted into a preliminary injunction pursuant to Rule 65. At the October 4, 1991 hearing, plaintiffs established service on nearly all defendants, including Bon-

nie Behn and Carla Rainero, and James Duane, Esq. appeared on behalf of defendants. Defendants then moved to either dismiss or stay the action pursuant to the abstention doctrine. In a Decision and Order dated October 29, 1990, the Court denied defendants' motion to dismiss or stay the case. In an Order dated November 2, 1990, the Court, with defendants' consent, ordered that the TRO would remain in effect until the motion for a preliminary injunction was decided.[1]

---

1. The Court granted the motion for a preliminary injunction in a Decision and Order dated February 14, 1992.

On October 22, 1990, plaintiffs filed a petition for contempt against defendants Bonnie Behn and Carla Rainero alleging that they violated the TRO on October 20, 1990. As stated earlier, an evidentiary hearing on plaintiffs' petition was held over the course of several days from June 18, 1991 to July 12, 1991. Plaintiffs called as witnesses Deborah Warnes, Cathleen McGuire, Marilynn Buckham and Lauren Zorfas. Defendants called as witnesses Thomas Troy, Barbara Toth and Richard Krolewicz. Behn and Rainero also testified. Following the hearing, the parties were given an opportunity to brief and argue their respective positions.

## FINDINGS OF FACT

During the morning of October 20, 1990, Bonnie Behn and Carla Rainero were located in the vicinity of the Buffalo GYN Womenservices clinic at 1241 Main Street, Buffalo, New York. Abortions are performed at the Buffalo GYN Womenservices clinic and it was the intention of Behn and Rainero to dissuade women entering the clinic from obtaining abortions by offering them "sidewalk counseling."

At about 8:25 a.m., Behn and Rainero were standing on the northeast corner of the intersection of Main and Northampton Streets when an automobile heading west on Northampton Street slowly approached the intersection. The vehicle contained two young men and a young woman who were apparently searching for the Buffalo GYN Womenservices clinic. The vehicle stopped at the intersection at which time Behn and Rainero approached the vehicle and tried to give the occupants literature.

The vehicle then turned right and headed north on Main Street. It proceeded upon main Street for one block and turned left on Bryant Street. Behn and Rainero walked north along the east side of Main Street in pursuit of the vehicle and its occupants. Upon reaching the intersection of Bryant and Main, they observed the two young men and the young woman whom them had earlier observed in the vehicle walking east on Bryant toward Main. One of the young men was walking ahead of the others. He arrived at the intersection of Bryant and Main first and approached a pay telephone located on the corner.

Behn and Rainero crossed Main and began talking to the young woman who by that time had arrived at the corner. A short time after Behn and Rainero crossed Main Street, three "pro-choice" escorts, Deborah Warnes, Cathleen McGuire and Lauren Zorfas, who were located in the vicinity of the clinic, crossed Main Street and headed north toward the young woman and her companions in order to offer to escort them to the clinic.

Behn and Rainero initially asked the young woman whether she was seeking an abortion and offered her some literature. The woman responded that she was seeking an abortion but she refused to accept any litera-ture. Behn and Rainero then told her of alternatives to having an abortion, such as adoption or keeping the child. They also offered her assistance and a place to stay if she decided to have the child. The young woman refused all offers of assistance.

Approximately two minutes after Behn and Rainero began talking to the young woman, the three "pro-choice" escorts arrived at the corner and told the young woman and her companions that they were from the clinic. Upon hearing this, one of the young men stated, "Thank God." The escorts then offered to escort the young woman and her companions to the clinic. The young woman accepted the offer and began walking south on Main Street toward the clinic with the escorts. Behn and Rainero walked along side the young woman, her companions and the escorts, and continued talking to the young woman.

At one point, Behn offered to call the young woman's mother and inform her that the young woman was going to have an abortion. Upon hearing this, the young woman became visibly upset and agitated, and responded, "No. The same thing happened to my sister. I can't. I can't do that." Despite this response, Behn continued to ask the young woman whether she wanted Behn to call her mother.

As the young woman attempted to make her way toward the clinic, Behn and Rainero continued to talk to her. The young woman became increasingly upset and began crying, whimpering and shaking. She was particularly upset by Behn's constant offers to call her mother.

Finally, one of the "pro-choice" escorts explained to the young woman that there was a TRO in effect and Behn and Rainero would have to stop talking to her if she asked them to do

so. The young woman turned to Behn and Rainero and asked them to leave her alone. Despite Behn and Rainero's testimony to the contrary, it was clear that the young woman was asking both Behn and Rainero to leave her alone.

In response to the request to be left alone, Behn took a step back, said, "Carla," and nodded to Rainero to move forward and continue talking to the young woman "as if it were a tag team relay." Rainero moved closer to the young woman and began talking to. her. One of the "pro-choice" escorts told Rainero that the young woman had already asked to be left alone. Rainero responded that, "She didn't say it to me." The "pro-choice" escort suggested to the young woman that she again ask Rainero to leave her alone. The young woman then turned to Rainero and asked Rainero to leave her alone. Behn and Rainero, however, ignored the young woman's pleas to be left alone and continue to pursue her and communicate their message all the way up to the clinic's Main Street entrance.[2]

---

2. Plaintiffs also allege that there was a second incident involving Behn that occurred at about 11:10 a.m. on October 20, 1990. However, there was little evidence adduced at the hearing concerning the second incident. Thus, the Court has not considered this incident in its decision.

At some point during this incident, two male "pro-life" demonstrators who were on the east side of Main Street crossed the street and began to follow the young woman, her companions, the "pro-choice" escorts, Behn and Rainero down Main Street toward the clinic. One of these men, Richard Krolewicz, was carrying a video camera and appeared to be videotaping the incident.

At the hearing, defendants produced Krolewicz's videotape. While the videotape was admitted into evidence, the Court has given it little consideration in its decision as there is a significant gap in the middle of the tape. The tape begins by showing the "pro-choice" escorts crossing Main Street as they headed toward the young woman and her companions on the corner of Bryant and Main. However, the tape then jumps ahead approximately five minutes and shows the young woman, her companions, the "pro-choice" escorts, Behn and Rainero heading south on Main Street back toward the clinic. Thus, the crucial portion of the incident when Behn and Rainero were alleged to have violated the TRO is not included on the tape. Accordingly, the Court find that the videotape is not a fair and accurate representation of the pertinent facts and will rely instead on the testimony adduced at trial.

Pro–Choice Network, No. 90–CVA–1004A, slip op. at 3–10.

The court awarded $10,000 to the Plaintiff as civil damages; found that attorney's fees and costs should also be awarded; and referred that issue to a Magistrate Judge for computation. The other Decision and Order that is here sought to be declared nondischargeable is that of March 15, 1994, wherein the District Court approved the Magistrate Judge's recommended computation of $25,260.16 in attorney's fees and costs. See *Pro–Choice Network of Western New York v. Project Rescue New York*, 848 F.Supp. 400, 413 (W.D.N.Y.1994).

## THE PRESENT COURT'S DISCUSSION

### Preclusion, in general

As stated at the outset, the Plaintiff argues that it need not try this matter here because the prior District Court proceedings and ruling established all of the requisites to this § 523(a)(6) Complaint with preclusive effect. The Debtor disagrees and seeks a new day in court, in this forum.

This Court has twice addressed the law governing the preclusive effect of pre-bankruptcy judgments in dischargeability proceedings. See *Marine Midland Bank, N.A. v. Huber (In re Huber)*, 171 B.R. 740, 747–49 (Bankr.W.D.N.Y.1994); *Nowak v. Pillich (In re Pillich)*, No. 96–1150 slip op. at 6–12 (Bankr.W.D.N.Y. Nov. 6, 1996) affd. 96–CV–0809 E(F) slip op. (W.D.N.Y. Sept. 10, 1997).

█ The primary questions under those decisions are (1) did the defendant have sufficient incentive in the pre-bankruptcy proceedings, to defend herself as if a bankruptcy discharge might be at stake (so to speak), and (2) whether the pre-bankruptcy proceedings resulted in a determination that is "sufficiently coincident with the standards that would govern an original action" brought here under § 523(a)(6), that it would support my finding, in an exercise of my original jurisdiction over this dischargeability issue, that a "willful and malicious" injury was proven by at least a fair preponderance of the evidence,[3] in the earlier proceeding. That the Debtor's incentive to defend herself in District court was substantial is not disputed. But, the Debtor argues that she did not act "maliciously," for § 523(a)(6) purposes.

### What is "willful and malicious?"

In *McAlister v. Slosberg*, Chief Bankruptcy Judge Haines of the District of Maine undertook the most thorough examination (to date) of the impact of the U.S. Supreme Court decision in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) upon the definition of "willful and malicious injury" under U.S.C. § 523(a)(6). See *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9 (Bankr.D.Me. 1998). In *Slosberg*, the court gently took issue with the notion that under the *Geiger* decision, "actual or Biblical malice is required." He quoted from a famous essay in which Oliver Wendell Holmes, Jr. distinguished malice "in law" from malice "in morals," and posited that because "no one

doubts that a man may be liable ... for false statements manifestly calculated to inflict temporal damage" even though those statements were made "without any malevolent motive at all," it follows that "malice" as used in the law "means nothing about motives, or even about the defendant's attitude toward the future, but only signifies that the tendency of his conduct under the known circumstances was very plainly to cause the plaintiff temporal harm." *Id.* at 21 n. 18 (quoting Oliver Wendell Holmes, Jr. 160, 164–65 (Richard A. Posner Ed., 1992)).

█ Based on that distinction and other considerations, Chief Bankruptcy Judge Haines concluded that after *Geiger*, "[a] showing of malice requires a showing that the debtor's willful, injurious conduct was undertaken without just cause or excuse." *Id.* at 21. It would seem to this writer from that analysis that the actor's moral motives are irrelevant; "Biblical malice" in the form of "hatred, spite, or ill will" is not required to be proven by a § 523(a)(6) plaintiff.

Three Circuits have also considered the issue since *Geiger*. The Sixth Circuit stated the matter this way:

"[U]nless 'the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,' Restatement (Second) of Torts § 8A, at 15 (1964), he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)."

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999).

In *Miller v. J.D. Abrams (In re Miller)*, 156 F.3d 598 (5th Cir.1998) the Fifth Circuit, however, specifically rejected any inclusion of the phrase "without just cause or excuse" in the definition of "malice." "Where injury is intentional, as it now must be under [*Geiger*], it cannot be justified or excused." *Id.* at 606. And the

---

**3.** See *Grogan v. Garner*, 498 U.S. 279, 290– 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

truly innocent are protected because if someone were to act under "an honest, but mistaken belief" regarding the circumstances, a court would correctly conclude that "[s]uch an individual cannot be said to have intentionally caused injury . . . .legally cognizable injury would not meet the test of 'not substantially certain to result,' in the absence of the fact about which there has been a mistake." *Id.* That court concluded simply that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm. . . . [T]reatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word [that is modified by both "willful" and "malicious"] is 'injury.'" *Id.*

In *Hobson Mould Works v. Madsen,* the Eighth Circuit noted that *Geiger* requires deliberate or intentional injury. See *Hobson Mould Works v. Madsen (In re Madsen),* 195 F.3d 988, 989 (8th Cir. 1999). Relying on its own precedent, the Court also stated that in order to satisfy the "willfulness" requirement of 523(a)(6), the debtor's actions must have been "headstrong and knowing." *Id.* (citing *In re Long,* 774 F.2d 875 (8th Cir.1985)). The Court also stated that to be "malicious," the debtor's actions must have been "targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.*

### Certain court orders present a special case

The present court need not reconcile the above disagreement about whether "malicious" and "willful" are a unity or are separate modifiers, for it seems clear to this writer that in the context of violations of certain court orders, the dispute is academic.

Specifically, when a court of the United States (see 28 U.S.C. § 451) issues an injunction or other protective order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order (as is proven either in the bankruptcy court or (so long as there was a full and fair opportunity to litigate the questions of volition and violation) in the issuing court) are *ipso facto* the result of a "willful and malicious injury."

This is because what is "just" or "unjust" conduct as between the parties has been defined by the court. That is what a court of law does in certain injunctions. An intentional violation of the order is necessarily without "just cause or excuse" and cannot be viewed as not having the intention to cause the very harm to the protected persons that order was designed to prevent.

There are three safeguards for any debtor in this formulation. Firstly, the injunction or other protective order would, by law, have been issued in a judicial proceeding in which the debtor was a party who received at least the protections of Rule 65 F.R.Civ.P., if not more. Secondly, the violation was shown to have been intentional. And lastly, the elements of and size of the award were determined in accordance with well-settled standards applying to contempts. That these three safeguards were provided in this case is beyond this Court's power to review, for the earlier orders are final.[4]

The subject matter of the injunction is irrelevant so long as the plaintiff in the § 523(a)(6) action was a protected party under the order. It makes no difference whether, for example, the order protected the right of clinics or others to provide lawful medical procedures to its patients,

---

4. A bankruptcy court may not look behind a final judgment of any court of record, to the extent that that court adjudicated a matter properly before that court. See *Kelleran v. Andrijevic,* 825 F.2d 692, 695–96 (2d Cir. 1987). Rather, what is before this court is

whether what was established there was not only what the earlier court found it to be (in this case a contempt of court), but also conduct that falls within the scope of the Bankruptcy Code's recitation of "exceptions to discharge."

or protected a woman from unwanted contact with an estranged spouse or a stalker, or protected one charged with a crime from being accosted by the father of the victim, or protected a business from disparagement of its name, or protected a litigant from suffering its opponent's placing the object of the litigation out of reach.

So long as the federal court with jurisdiction over the person who later files bankruptcy, has issued an order for the protection of someone else,[5] and has communicated it clearly to the contemnor, then an intentional violation is not only willful, but is also "malicious" *per se*. The federal court has told the defendant the point at which lawful activity becomes "harm" under the law. To intend the violation is to intend the harm. What "cause" or "excuse" might be "just" was considered by the court in fashioning the protective order, and is not to be re-litigated when deciding whether the violation was intentional.

Indeed, few debtors who are the subject of § 523(a)(6) complaints are so fortunate as to have been told by a federal court what actions would or would not be "just," before she acts. Nothing more could be asked of a bankruptcy process that is designed to protect the debtor that is not merely "honest," but is also "unfortunate."[6]

Only two questions remain in this regard, one of which is not disputed.

It is not disputed that the proceedings in the District Court (both the proceeding that led up to the Temporary Restraining Order and the proceedings resulting in the judgment against this Debtor) were full and fair.

But does what was decided there compel a § 523(a)(6) finding for the Plaintiff here? I disagree with the applicability, in an 11 U.S.C. § 523 context, of general principles of collateral estoppel and *res judicata* that would require that the pre-bankruptcy rulings be ignored unless the pre-bankruptcy issue was "identical" to the later-presented issue.[7] Rather, as noted in *Huber*, I believe that it suffices that the record made in the pre-bankruptcy court enable this Court to reach a conclusion about whether the facts as found either compel or do not compel a § 523 finding for one party or the other. This Court may look past the decision to the evidence presented, if necessary.[8]

In these particulars, the Debtor argues that: (1) any finding of willfulness by the District Court was dictum in light of that court's statement (in Part IV of its Conclusions of Law) that "It is not necessary for the plaintiff to prove that the defendant wilfully disobeyed the order,"[9] and (2) her action was not aimed at this Plaintiff, but was aimed at the individual who appeared to be seeking an abortion, and whose identity has never been revealed.

---

5. Here the order arguably did not set up a protection so much as it limited the Debtor's freedom of expression with regard to the right of others to conduct lawful activity. For present purposes the distinction is not important because in either event, the contemnor was told what activity would be found to impede the lawful rights of others.

6. See *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). The Court leaves to another day the question of the applicability of § 523(a)(6) in other fact patterns, such as if there had been no court order directed specifically at the debtor, and instead the debt arose out of a judgment for trespass or menacing.

7. Cf. *Federal Trade Comm. v. Wright (In re Wright)*, 187 B.R. 826, 832–33 (Bankr. D.Conn.1995).

8. See Jeffrey Thomas Ferriell, The Preclusive Effect of State Court Decisions in Bankruptcy (pt. 1), 58 Am. Bankr.L.J. 349, 361–62, & nn. 69–71 (1984).

9. The District Court used the other correct spelling—both "willful" and "wilful" are correct. I use "willful" in this Decision because that is the spelling used in § 523(a)(6), which statute was not before the District Court.

The first argument fails, not because it misstates the District Court's holding—it states it correctly—but because it ignores the fact that that holding applied only to the finding of *liability.* As to *damages,* the District Court stated that "... a successful complainant in a contempt proceeding is entitled to ... attorney's fees, if the violation of the Court's order is found to have been wilful .... [T]he Court finds that [Behn's] violation of the Temporary Restraining Order was wilful." *Pro-Choice Network of Western New York v. Project Rescue Western New York,* No. 90–CV–1004A, slip op. at 21. In an exercise of my independent jurisdiction under 11 U.S.C. § 523(a)(6), I find from the background of the Temporary Restraining Order and from all of the District Court's Findings of Fact and Conclusions of Law that "willfulness" of the injury to this Plaintiff was established there by at least a fair preponderance of the evidence.

The second argument is foreclosed by the District Court's and Second Circuit's prior determination that this Plaintiff and other health care providers "have independent standing to assert the rights of their patients to travel freely and to obtain abortion services....[T]he clinics represent the rights and interests of the women seeking their assistance." *Id.* at 10, (quoting *N.Y. State Nat'l. Org. for Women v. Terry,* 886 F.2d 1339, 1348–49 (2d Cir. 1989)).

### "Affordability"

■ The Debtor points out in her disagreement with certain of the Plaintiff's alleged statements of "undisputed fact," that the amount of the sanctions assessed was based in part on "the financial consequences on [Ms. Behn] and the consequent seriousness of the burden of the sanction upon ... her." The District Court found in its 1992 Decision that Ms. Behn had not "made a showing that [she] would be unduly burdened by a substantial sanction." And in its 1994 Decision it affirmed the Magistrate Judge's recommendation while noting that the award will "strain" Ms. Behn's finances. Assuming that that finding was necessary to the award, is it entitled to preclusive effect in light of today's circumstances? (If it was necessary, but not preclusive, the Debtor might re-visit it; the fact that she is now in a bankruptcy proceeding might hint that any suggestion of "affordability" was in error.)

Those findings were in 1992 and 1994. It appears that nothing was ever paid to the Plaintiff and this Court has no knowledge of any collection efforts undertaken by Plaintiff. But in March of 1999, Ms. Behn and her husband filed a joint petition here under Chapter 7, declaring that she is unemployed; that her husband is retired; that their only income is $1,800/mo. (from his pension); that their average monthly expenses are $1635.00; and that they have approximately $20,000 in other unsecured debt (now discharged in bankruptcy). They are renters, not homeowners, and they have one car (1994 model). The Trustee has filed a report that there are "No [non-exempt] Assets" to administer in this bankruptcy case.

Ms. Behn and spouse disclose that their 1997 income was $43,865 and that their 1998 income was $35,956. Thus their rather spare existence may be of very recent origin.

There are at least three reasons why this Court may not concern itself with Ms. Behn's "affordability" argument.

■ 1. This Court does not sit in review of a pre-bankruptcy judgment and may not look behind the judgment, absent fraud or collusion. *Kelleran v. Andrijevic,* 825 F.2d 692, 695–96 (2d Cir.1987). The finding must be treated as binding, when it became final.

2. Bankruptcy might well be an eventual consequence of contempt sanctions, and might well be viewed by the sanctioning court as an eventuality that is not "unduly burdensome" as measured against the rights of the injured party and the

need to compel obedience to orders of the court.[10]

3. Poverty may be a resort of choice by a contemnor who chooses to avoid paying the sanction, and often there would be no way for the injured party to prove that the financial decline was a vindictive choice rather than innocent misfortune.

If there is any basis in law under which the Debtor could even now petition the District Court for a reduction in the amount of the award in light of changed circumstances and this judgment of non-dischargeability (which judgment is itself reviewable by that court under 28 U.S.C. § 158), she is free to do so, and only such a reduced amount as then results will be nondischargeable under this Decision and Order.[11]

## FINDINGS OF FACT

Having made the above conclusions regarding the applicable law, there are few findings of fact needed to be made.

1. It is undisputed that the Debtor Bonnie Behn, is the same Bonnie Behn named in the September 27, 1990 Temporary Restraining Order issued by the U.S. District Court for this District.

■ 2. It is undisputed that she was found in the District Court's Decision and Order of August 14, 1992 to have knowingly and intentionally violated the Temporary Restraining Order. And that finding utilized even a stricter standard of proof than the "fair preponderance" standard required under § 523.

3. It is undisputed that she was found liable to the Plaintiff as a consequence of that violation.

**10.** In its 1994 Decision, the District Court noted the strain on Ms. Behn's resources but emphasized the "egregious" nature of her conduct. See 484 F.Supp. at 404.

**11.** There is an analogy in the area of debts arising out of a marital dissolution. Many 11 U.S.C. § 523(a)(5) defenses are to the effect

4. It is undisputed that the pre-bankruptcy findings and judgments are final.

5. As explained above, I find from the District Court's Decisions (but as a matter of my own jurisdiction) that the two awards at issue are debts caused by a "willful and malicious injury" by her upon the Plaintiff, within the meaning of 11 U.S.C. § 523(a)(6). This finding rests in part upon the background leading to the Temporary Restraining Order, as set forth by the District Court and by the Supreme Court. (Ms. Behn and others were restrained because they had persisted in actions that were "knowing violations" of the public peace and of the lawful rights of others. She was not sanctioned for a moment of action that was well-intentioned, but misguided.)

## ATTORNEY'S FEES

The Plaintiff has moved to amend the Complaint to add a request for attorney's fees incurred in connection with this dischargeability proceeding. The Debtor opposes, arguing that there is no theory that would sustain such a request.

■ *In re Lutgen* taught that if attorney's fees for enforcing a debt are available under non-bankruptcy law, then they are available here. See *Wegmans Food Markets, Inc. v. Lutgen (In re Lutgen)*, No. 98–CV–0764E (SC), 1999 WL 222605, at 2–3 (W.D.N.Y. April 5, 1999). Thus, as explained in *In re Reid*, this Court is of the view that it must award attorney's fees incurred here, as part of the judgment of nondischargeability, if the Plaintiff would be entitled to them under non-bankruptcy law. See *F.C.C. National Bank v. Reid (In re Reid)*, 237 B.R. 577, (Bankr. W.D.N.Y.1999).

that the matrimonial court "got it wrong" as to affordability. Such a defense is of no legal effect here. Sending the debtor back to matrimonial court is often part of a judgment against the debtor in a § 523(a)(5) action, if that reopening of the matter is available under non-bankruptcy law.

Here, obviously, there is no contract provision for such fees as there was in *Lutgen.* Nor is there a statutory entitlement as in *Cohen v. De La Cruz.* See 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341. Nor is there cause in this Court for a finding of vexatious litigation, etc. that would abrogate the American Rule for the Debtor's defending this action here. The Debtor's defense has not been frivolous in substance or in presentation. Indeed, both counsel are to be commended for their zealous yet civil presentation of an issue that otherwise might have been devastatingly charged with emotion.

■ However, this Court has often held in a different context (the alimony, maintenance and support context) that a debtor's forcing the holder of a nondischargeable claim to come here to prove that the claim is nondischargeable, may add to the nondischargeable claim the cost of so proving. The principle is that the purpose of awarding support is undermined if the debtor may force the dependant party to hire a lawyer to prove that it was indeed support. (This is qualitatively different from this writer's repeated, but now-reversed view that when the holder of a contract claim comes here to prove-up § 523(a)(2) fraud, the contract provision for fees has been discharged, even though the fraud has not been discharged. See *Lutgen,* 1999 WL 222605, at *2–3.)

■ Analogizing from the matrimonial content, I find that the very same considerations that entitle an injured party to attorney's fees when it proves a willful violation of a federal court order, warrant an award of attorney's fees here when the debtor who ends up in bankruptcy does not concede nondischargeability. Just as the purpose of a support obligation is undermined if one must hire a lawyer to "re"-prove here that the obligation was one for support, the purpose of an award of attorney's fees for an injury caused by a "willful" violation of a court order is undermined when one must hire a lawyer to "re"prove here that such a violation was indeed such an injury. Whether or not such fees "must" be awarded here, I find that they "should" be awarded, just as I have so held when a debtor argues unsuccessfully, but in good faith, that an award in matrimonial court was a property settlement, not a support award. This is not a punishment for raising a good faith defense.[12] Rather, it assures that the fact that the obstacle to enforcement that is raised by resort to the Bankruptcy Code and the obtaining of a discharge in this Court without offering a stipulation of nondischargeability, does not cause a loss to a plaintiff whose theory here is the very same as the theory upon which the nondischargeable debt rested.[13]

### CONCLUSION

Based on these findings, and on the law as articulated above, the Plaintiff is not required to relitigate the matter here, and is entitled also to costs and attorney's fees incurred here.

The Clerk shall enter judgment as follows: "The Judgments of the U.S. District

---

**12.** Such disputes are often highly substantial, challenging the "labels" attached to the matrimonial court's order. Was a provision a "support" provision even though the agreement and decree "waived support"? Was a provision labeled "support" really a property settlement instead? But it is this writer's experience that (1) some debtors file for relief under the Bankruptcy Code in order to better abide by support orders, and (2) many (if not most) debtors who contest § 523(a)(5) claims do so to continue, rather than to end, the vindictive phase of the breakup. No good purpose is served by a ruling does not place a debtor at risk of added debt to someone else as well as his own lawyer, if he raises bankruptcy as a new sword, rather than as a shield that will permit him to face, in good faith, his nondischargeable obligations.

**13.** Again, prior to *In re Lutgen,* this writer viewed § 523(a)(2) "fraud" to be different from a contract right to attorney's fees, but viewed pursuit of nondischargeable support here under § 523(a)(5) as simply an identical pursuit here. Clearly, pursuing the claim for "wilful and malicious injury" here is the same as the earlier pursuit.

Court in the total amount of $35,260.16 are not discharged and remain enforceable. Plaintiff may seek an additional money judgment in this Court for reasonable attorney's fees and costs within 30 days (by filing of a Motion and Notice of Motion), or shall otherwise waive such additional judgment."

SO ORDERED.